**Michelle KOSILEK, Plaintiff,**

v.

**Michael T. MALONEY, Defendant.**

**No. CIV.A.92–12820–MLW.**

United States District Court,
D. Massachusetts.

Aug. 28, 2002.

See also 2000 WL 1346898.

Michelle Kosilek, M.C.I. Norfolk, Norfolk, MA, pro se.

Jeffrey Jackson Pyle, Hill & Barlow, P.C., Frances S. Cohen, Jennifer L. Chiasson, Hill & Barlow, Boston, MA, for plaintiff.

Michael Franco, Law Offices of Beauregard & Burke, Philip N. Beauregard, Beauregard & Burke, New Bedford, MA, Alyson R. Ross, Borders & Ross, New Bedford, MA, Beverly R. Roby, Attorney General's Office, Richard C. McFarland, Department of Correction, Legal Division, Mary C. Firo–Barteryan, Department of Correction, Legal Division, Boston, MA, Herbert C. Hanson, Department of Correction, Boston, MA, for Defendants.

## OPINION

WOLF, District Judge.

### I. SUMMARY

Plaintiff Michelle Kosilek is serving a life sentence, without the possibility of parole, for murdering his wife. Kosilek is also suffering from a severe form of a rare, medically recognized, major mental illness—gender identity disorder ("GID"). Kosilek is a transsexual. Since at least age three, Kosilek has believed that he is actually a female who has been cruelly trapped in a male's body.[1] This belief has caused Kosilek to suffer constant mental anguish and, at times, abuse. While incarcerated, it has also caused Kosilek to attempt twice to kill himself, and to try to castrate himself as well.

The Harry Benjamin Standards of Care (the "Standards of Care") are protocols used by qualified professionals in the United States to treat individuals suffering from gender identity disorders. According to the Standards of Care, psychotherapy with a qualified therapist is sufficient treatment for some individuals. In other

---

1. The court recognizes that it is painful for Kosilek to be referred to as "he" and that courts have, at times, referred to male transsexuals as "she." *See, e.g., Farmer v. Perrill,* 275 F.3d 958 n. 1 (10th Cir.2001); *Schwenk v. Hartford,* 204 F.3d 1187, 1192 n. 1 (9th Cir. 2000). However, this court finds that referring to Kosilek by the male pronoun is necessary to make this Memorandum as clear as possible.

cases psychotherapy and the administration of female hormones provide adequate relief. There are, however, some cases in which sex reassignment surgery is medically necessary and appropriate.

Since being incarcerated in 1990, Kosilek has sought but not received any of the forms of treatment described in the Standards of Care. In 1992, Kosilek filed a *pro se* lawsuit, pursuant to 42 U.S.C. § 1983, against the Sheriff of Bristol County, David R. Nelson, and others. Kosilek generally alleged that he was being denied adequate medical care for his serious medical need in violation of the Eighth Amendment of the United States Constitution. Kosilek sought both damages and an injunction requiring that he be provided sex reassignment surgery. After his conviction and transfer to the Massachusetts Department of Corrections (the "DOC") in 1992, Kosilek amended his complaint to seek the same relief from the DOC.

Defendant Michael Maloney became the Commissioner of the DOC in 1997. In 1999, he became a defendant in this case.

In 1999, this court assumed responsibility for this case after the death of the magistrate judge who had been handling it for pretrial purposes. Counsel was obtained to represent Kosilek *pro bono* and filed another amended complaint.

The court granted the motions of Nelson and Maloney to dismiss the claims for damages against them individually based on qualified immunity, and granted Nelson's motion for summary judgment on the claims against him in his official capacity. Maloney's motion for summary judgment on Kosilek's claim for injunctive relief was denied. A non-jury trial concerning that claim was conducted in February 2002.

At trial, counsel for Kosilek represented that Kosilek is now requesting that the court issue an injunction requiring that he be provided with treatment in prison for gender identity disorder consistent with the Standards of Care. More specifically, Kosilek requests that the court order that Maloney: retain a doctor who specializes in treating gender identity disorders to evaluate Kosilek; authorize that doctor to prescribe any treatment deemed appropriate; and provide the treatment prescribed by that doctor. The court is not now being asked to order that Kosilek be administered female hormones or provided sex reassignment surgery. These are, however, forms of treatment that are provided to some, but not all, transsexuals pursuant to the Standards of Care. Thus, the injunction that Kosilek requests could ultimately require the administration of female hormones and, a year or more later, sex reassignment surgery.

Ordinarily, the Commissioner of the DOC would not be the appropriate defendant in a case involving an inmate's claim alleging a denial of medical care. As Commissioner, Maloney does not usually make decisions concerning medical care. It is his policy and usual practice to rely on the social workers and medical professionals employed by the DOC, and the outside experts they often consult, to determine whether an inmate has a serious medical need and, if so, what is necessary to treat it adequately.

Kosilek, however, has been dealt with differently. Because of Kosilek's lawsuit Maloney, as a practical matter, has made the major decisions relating to Kosilek's medical care.

As a result of this case, in consultation with attorneys and doctors employed by the DOC, in 2000 Maloney adopted a blanket policy concerning the treatment the DOC would provide to the several transsexual prisoners in its custody. That policy is aimed at "freezing" a transsexual in the condition he was in when incarcerated. It contemplates the administration of female hormones for inmates for whom they

were prescribed prior to incarceration. The policy strictly prohibits providing hormones to inmates like Kosilek who have taken only "black market" hormones previously. Maloney's policy also categorically excludes the possibility that an inmate will receive sex reassignment surgery. Because Maloney removed from the professionals employed by the DOC their usual discretion concerning Kosilek's medical needs and care, Maloney's conduct is properly the focus of this case.

Kosilek's claims involve facts that are unusual, but not unprecedented. In view of the general lack of public knowledge and understanding of gender identity disorders, the idea that an imprisoned male murderer may ever have a right to receive female hormones and sex reassignment surgery may understandably strike some people as bizarre. However, Kosilek's claims raise issues involving substantial jurisprudence concerning the application of the Eighth Amendment to inmates with serious medical needs. This case requires the neutral application of the principles that emerge from that jurisprudence to the facts established by the evidence in this case.

The Eighth Amendment prohibits Cruel and Unusual Punishment. The Supreme Court has explained that "[t]he Amendment embodies broad and idealistic concepts of dignity, civilized standards, humanity, and decency ...." *Estelle v. Gamble*, 429 U.S. 97, 102, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (internal quotation and citation omitted).

■ Among other things, the Eighth Amendment does not permit the unnecessary infliction of pain on a prisoner, either intentionally or because of the deliberate indifference of the responsible prison official. Any such infliction of pain is deemed "wanton." The wanton infliction of pain on an inmate violates the Eighth Amendment.

■ Prisoners in the United States have a right to humane treatment, including a right to adequate care for their serious medical needs. The Constitution does not protect this right because we are a nation that coddles criminals. Rather, we recognize and respect this right because we are, fundamentally, a decent people, and decent people do not allow other human beings in their custody to suffer needlessly from serious illness or injury.

■ Nevertheless, because the Eighth Amendment prohibits only certain punishments, to establish a violation when a prisoner's health is at issue, it is not sufficient for an inmate to prove only that he has not received adequate medical care. Rather, he must also prove that the official responsible for his care has intentionally ignored a serious medical need or been deliberately indifferent to it.

■ Accordingly, the Eighth Amendment standard has an objective and subjective component. With regard to the objective prong, it must be proven that there is a serious medical need and that adequate care has not been provided. A serious medical need is one that involves a substantial risk of serious harm if it is not adequately treated. Typically, it is a need that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.

■ Adequate care requires treatment by qualified personnel, who provide services that are of a quality acceptable when measured by prudent professional standards in the community. Adequate care is tailored to an inmate's particular medical needs and is based on medical considerations.

■ An inmate is not entitled to the care of his choice. Courts must defer to

the decisions of prison officials concerning what form of adequate care to provide an inmate. However, courts must decide if the care being provided is minimally adequate.

The subjective prong of the deliberate indifference test also has two parts. The responsible official must be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists. He must also draw that inference.

■ Because the Eighth Amendment proscribes the *unnecessary* infliction of pain on a prisoner, the practical constraints imposed by the prison environment are relevant to whether the subjective component of the Eighth Amendment test has been satisfied. The duty of prison officials to protect the safety of inmates and prison personnel is a factor that may properly be considered in prescribing medical care for a serious medical need. It is conceivable that a prison official, acting reasonably and in good faith, might perceive an irreconcilable conflict between his duty to protect safety and his duty to provide an inmate adequate medical care. If so, his decision not to provide that care might not violate the Eighth Amendment because the resulting infliction of pain on the inmate would not be unnecessary or wanton. Rather, it might be reasonable and reasonable conduct does not violate the Eighth Amendment.

■ It is not, however, permissible to deny an inmate adequate medical care because it is costly. In recognition of this, prison officials at times authorize CAT scans, dialysis, and other forms of expensive medical care required to diagnose or treat familiar forms of serious illness.

■ If deliberate indifference to a serious medical need is proven, in order to obtain an injunction, an inmate must also prove that it is likely to continue in the future.

Thus, to prevail in this case, Kosilek is required to prove that: (1) he has a serious medical need; (2) which has not been adequately treated; (3) because of Maloney's deliberate indifference; and (4) that deliberate indifference is likely to continue in the future.

Kosilek has proven the first two elements of his claim, but not the last two. Kosilek has a serious medical need. He has not been offered adequate medical treatment for it. Indeed, he has been offered no real treatment at all. Therefore, the objective component of the Eighth Amendment standard has been proven.

Kosilek has not, however, satisfied the subjective component of the test. Maloney knew many facts from which it could have been inferred that Kosilek was at substantial risk of serious harm if he did not receive adequate treatment. Maloney did not, however, actually draw that inference.

Because of this litigation and the unusual issues it involves, Kosilek's medical needs have not been addressed in a manner consistent with the DOC's usual policy and practice. Qualified physicians have never evaluated Kosilek for the primary purpose of prescribing treatment. Rather, they have been employed as potential expert witnesses in this case.

Because of the pendency of this case, Maloney as a practical matter removed from the medical personnel the DOC employs their usual authority to diagnose and treat Kosilek. Maloney, who is not qualified to make medical judgments, was prompted by this case to adopt a rigid, freeze-frame policy. This policy effectively prohibits DOC doctors and social workers from considering for Kosilek hormone therapy and sex reassignment surgery, which are forms of treatment prescribed by qualified professionals in the community for some, but not all, individuals suffer-

ing from severe gender identity disorders. As a result of that policy, no individualized medical evaluation has been done for the purpose of prescribing treatment for Kosilek's serious medical need.

Maloney, however, did not adopt his policy with the intent to inflict pain on Kosilek or as a result of deliberate indifference. Maloney did not focus on Kosilek's medical needs. He acted as a defendant with a legal problem. He has been reluctant to allow Kosilek to receive hormones or sex reassignment surgery unless he was legally required to do so. His reluctance has been rooted in sincere security concerns, and in a fear of public and political criticism as well. Maloney has not been influenced by the possibility that treatment for Kosilek might be expensive. Rather, he has been concerned that any expenditure for hormones or sex reassignment surgery might be an inappropriate use of taxpayers' money.

 As stated earlier, security is a legitimate consideration for Eighth Amendment purposes. A concern about political or public criticism for discharging a constitutional duty is not.

State and local officials, like judges, have a duty to obey the Constitution. The Bill of Rights provides citizens, including those who are incarcerated, with certain rights that even a majority of their contemporaries cannot properly decide to violate. Prison officials share with the courts the duty to protect those rights, even if they believe that it may be unpopular to do so.

This court's decision puts Maloney on notice that Kosilek has a serious medical need which is not being properly treated. Therefore, he has a duty to respond reasonably to it. The court expects that he will.

In essence, the court expects that Maloney will allow qualified medical professionals to recommend treatment for Kosilek. At a minimum, psychotherapy with, or un-der the direction of, a professional with training and experience concerning individuals with severe gender identity disorder is required. Such therapy should raise no security concerns.

If hormones or sex reassignment surgery are recommended, Maloney may properly consider whether security issues make it impossible to provide adequate medical care in prison for Kosilek's serious medical need. The court expects that any such consideration will include the following facts.

Kosilek is already living largely as a woman in a medium security male prison. This has not presented a security problem. The policy Maloney adopted contemplates continuing female hormones for transsexuals for whom they have been prescribed prior to incarceration. Maloney expects that he would keep such inmates in the general population of a male prison. This has, evidently, been done safely in several states, in the United States Bureau of Prisons system, and in Canada.

If Maloney, in good faith, reasonably decides that there is truly no way that he can discharge both his duty to protect safety and his duty to provide Kosilek with adequate medical care, and concludes that security concerns must trump the recommendations of qualified medical professionals, a court will have to decide whether the Eighth Amendment has been violated. That question is not now before this court. If, however, concerns about cost or controversy prompt Maloney to deny Kosilek adequate care for his serious medical need, Maloney will have violated the Eighth Amendment. Kosilek will then likely be entitled to the injunction that he has unsuccessfully sought in this case.

## II. FINDINGS OF FACT

The following facts are proven by a preponderance of the credible evidence.

It is not disputed that Kosilek has a genuine gender identity disorder. A gender identity disorder is defined by the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition–Text Revision ("DSM–IV–TR") [2] as a major mental illness. Generally, and in this case, a person suffering from a gender identity disorder has the anatomy of a male, but a brain that in effect tells him that he is a female.

Individuals suffering from a gender identity disorder are sometimes referred to as "transsexuals." Ex. 7, at 3–4. The Supreme Court has accurately described a transsexual as a person who has:

> "[a] rare psychiatric disorder in which a person feels persistently uncomfortable about his or her anatomical sex, and who typically seeks medical treatment, including hormone therapy and surgery, to bring about a permanent sex change."

*Farmer v. Brennan*, 511 U.S. 825, 829, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (quoting American Medical Association, *Encyclopedia of Medicine* 1006 (1989)).

The consensus of medical professionals is that transsexualism is biological and innate. It is not a freely chosen "sexual preference" or produced by an individual's life experience.

The DSM–IV–TR includes four diagnostic criteria for a gender identity disorder:

A. A strong and persistent cross-gender identification (not merely a desire for any perceived cultural advantages of being the other sex)

&ast; &ast; &ast; &ast; &ast; &ast;

B. Persistent discomfort with his or her sex or sense of inappropriateness in the gender role of that sex

&ast; &ast; &ast; &ast; &ast; &ast;

C. The disturbance is not concurrent with an intersex condition [meaning sexually ambiguous genitalia]

&ast; &ast; &ast; &ast; &ast; &ast;

D. The disturbance causes clinically significant distress or impairment in social, occupational, or other important areas of functioning.

Ex. 6A, at 581.

Kosilek is now fifty-three years old. Kosilek has long held a strong and persistent belief that he is a woman trapped in a man's body. The severity of Kosilek's gender identity disorder is evidenced, in part, by Kosilek's history of drug abuse and use of female hormones.

At the age of three, Kosilek was left by his mother in an orphanage, where he was frequently punished for dressing as a female. Beginning at the age of ten, he was reunited with his mother, repeatedly raped by his grandfather, and stabbed by his stepfather for his announced desire to live as a girl.

As a teenager, Kosilek ran away from home, often dressed as a woman, engaged in prostitution, and abused illegal drugs. From 1967 to 1968, Kosilek received female hormones prescribed by a physician in exchange for sex. He also took hormones for several months in 1971 and 1972. While on hormones, Kosilek "felt normal" for the first time in his life.

As a result of taking hormones in 1971 and 1972, Kosilek developed breasts. When imprisoned in Chicago in this condition, Kosilek was gang raped in 1971 and 1972. He was also assaulted outside a gay bar by two men who said they resented his effort to become a girl. Kosilek was beaten so badly that he stopped taking hormones.

---

**2.** The DSM–IV–TR is regularly relied upon by professionals to define and diagnose mental illnesses. The DSM–IV was an earlier edition of the manual.

Although he had dropped out of high school, Kosilek managed to earn a college degree and to work productively for periods of time. Despite his painful belief that he was truly a female, Kosilek did not seek treatment for his gender identity disorder.

After relapsing into drug abuse, Kosilek entered a drug rehabilitation facility. There he met Cheryl McCaul, who was working as a volunteer counselor. McCaul told Kosilek that his transsexualism would be cured by "a good woman," and married him. However, Kosilek's distress did not abate. In 1990, Kosilek murdered McCaul.

Kosilek was incarcerated at the Bristol County Jail pending trial. Kosilek's case immediately received a great deal of publicity, in part because he was wearing female clothing when arrested. Later, when Kosilek's efforts to obtain treatment for his gender identity disorder at his own expense failed, Kosilek engaged in a publicized campaign to be elected Sheriff. He also initiated a *pro se* lawsuit against the Sheriff and others, claiming a denial of necessary medical care.

While detained pending trial at the Bristol County Jail, Kosilek again took female hormones in the form of birth control pills. The pills were illegally provided by a guard.

Bristol County Jail officials allowed Kosilek, at his own expense, to consult an expert in gender identity disorders, Dr. Nancy Strapko, in preparation for his trial. Dr. Strapko was not, however, permitted to provide any treatment to Kosilek. The Sheriff also did not follow Dr. Strapko's recommendation that Kosilek begin psychotherapy with a qualified specialist to address his gender identity disorder.

Kosilek twice tried to commit suicide while awaiting trial. One attempt occurred when he was taking the antidepressant Prozac. In addition, Kosilek attempted to castrate himself.

Kosilek was convicted of murder and sentenced in 1992 to life in prison without the possibility of parole. In January 1993 he was placed in the custody of the Commissioner of the DOC.

When Kosilek was transferred to the custody of the DOC, an intake form noted that he had "minor breast development." Ex. 10, at 3. This breast development evidently resulted from the hormones that Kosilek had been taking at the Bristol County Jail.

Since 1994, Kosilek has been incarcerated in the general population at MCI–Norfolk, a medium-security male prison. There, Kosilek has attempted to live as a woman to the maximum extent possible. Kosilek had his name legally changed from Robert to Michelle. Virtually all of the inmates and guards now call Kosilek "Michelle." Kosilek has grown his fingernails and hair long, modulated his voice to sound more feminine, had his clothing tailored to appear more feminine, and used various products as makeup.

Kosilek has not been assaulted sexually while at MCI–Norfolk. Nor does the evidence indicate that Kosilek has voluntarily had sexual relations with any other inmate.

Kosilek has demanded that prison officials at MCI–Norfolk provide treatment for his gender identity disorder. When his demands were not met, Kosilek amended his complaint to add allegations concerning his treatment by the DOC and filed many motions. Kosilek's case against Nelson and the present suit have provided Kosilek with hope. As a result, Kosilek has behaved well in prison and has been properly perceived by prison officials as not presenting a high risk of imminent harm to himself.

However, Kosilek has repeatedly expressed his intention to kill himself if he does not obtain relief in this case. The

court concludes that there is a high risk that Kosilek will harm himself if he does not receive adequate treatment for his severe mental illness. Kosilek's stated intention to kill himself is not merely a threat made to manipulate the DOC or the court. As Dr. Marshall Forstein persuasively put it, he has never known a "heterosexual man want to voluntarily give us his penis to get something like hormones." The court concludes that Kosilek's gender identity disorder is causing him severe emotional distress.

Dr. George Brown opined that if Kosilek does not receive hormone treatments, "the likelihood is exceedingly close to one hundred percent that she will kill herself." [3] The DOC is committed to trying to prevent this. However, the court finds that absent adequate treatment, there is a significant risk that Kosilek will again attempt suicide and may, like some other inmates, succeed. [4]

In 1999, Gregory Hughes, the DOC Regional Administrator for Mental Health, spoke with Dr. Kenneth Appelbaum, a University of Massachusetts Medical School psychiatrist and the Director of the program which provides mental health care to DOC inmates, and his colleague Dr. Ira Packer of the University of Massachusetts Medical School, about obtaining a multi-disciplinary psychological assessment of Kosilek. Hughes was interested in assessing Kosilek's needs for mental health services and in evaluating whether Kosilek in fact suffered from a gender identity disorder.

As a result, Kosilek met twice with Karen DeWees, a social worker who had no training or experience in treating gender identity disorders. Kosilek cooperated with DeWees during these sessions and provided historical information about himself.

DeWees caused Kosilek to be seen once by Dr. Jorge Veliz, a psychiatrist employed by the DOC who also did not have experience with gender identity disorders. Veliz did not testify at trial. According to Kosilek, however, Veliz recommended that Kosilek inform the court that he wanted sex reassignment surgery as well as hormones because hormones alone would be only a "band-aid approach." Feb. 5, 2002 Tr. at 70. Veliz referred Kosilek to Katherine Herzog, a staff psychologist at MCI–Norfolk, for psychological testing. Kosilek refused to participate in the testing because he had previously undergone similar tests and the results were available.

DeWees, Veliz, and Herzog issued a memorandum in about June or July 1999, concluding, among other things, that Kosilek appeared to meet some of the DSM–IV–TR criteria for a gender identity disorder. The memorandum stated: Kosilek "has a lengthy history of considering himself transgendered. In addition, his history reveals that he has struggled with drug addiction and dependence .... [and] has been treated for depression prior to his incarceration." Ex. 21., at 4. The memorandum noted that Kosilek "made a very good adjustment to prison life" and "has no acute psychiatric problems at this time." Id.

Kosilek persisted in seeking treatment for his gender identity disorder. As a result, in Fall 1999, Kosilek met with

---

**3.** The complete trial transcript has not been prepared. When possible, however, the court has cited the transcript for direct quotes from the trial testimony.

**4.** The court notes that the DOC employees who are most directly responsible for Kosilek,

Dr. Ira Packer, Gregory Hughes, and Mark Burrowes, agree with Kosilek's experts, Drs. Forstein and Brown, that there is a high risk that Kosilek will attempt suicide if he does not receive adequate treatment as a result of this case.

DeWees a number of times for supportive therapy sessions. At that time, Kosilek was not cooperative with DeWees because she did not have any training or experience in treating individuals with gender identity disorders and could not, therefore, provide the treatment Kosilek sought.

At trial Kosilek, through counsel, requested that the court issue an injunction requiring that he be provided with treatment in prison for gender identity disorder consistent with the Standards of Care. The Standards of Care are developed and published by international experts who specialize in the treatment of gender identity disorders. As explained by Kosilek's experts, Drs. Forstein and Brown, as well as by Dr. Appelbaum, the Standards of Care describe the generally accepted treatment for individuals with gender identity disorders in the community.

The following provisions of the Standards of Care are pertinent to this case. The eligibility requirements for certain treatments are "meant to be minimum requirements." Ex. 7, at 2. Clinical departures from the guidelines may be justified by a patient's "unique . . . social . . . situation," among other things. *Id.*

The Standards of Care establish a "triadic treatment sequence." This triadic sequence is comprised of: (1) hormone therapy; (2) a real-life experience of living as a member of the opposite sex; and (3) sex reassignment surgery. *Id.* at 3. According to the Standards of Care:

> *Many adults with gender identity disorder find comfortable, effective ways of living that do not involve all the components of the triadic treatment sequence.* While some individuals manage to do this on their own, psychotherapy can be very helpful in bringing about the dis-

covery and maturational processes that enable self-comfort.

*Id.* at 11 (emphasis added). However, "psychotherapy is not intended to cure the gender identity disorder." *Id.* at 12.

The Standards of Care state that cross-sex hormones are "often medically necessary" "for properly selected adults with gender identity disorders." *Id.* at 13. "They improve the quality of life and limit the psychiatric co-morbidity, which often accompanies lack of treatment." *Id.* In lay terms, this means that the administration of hormones to a transsexual typically diminishes co-existing serious psychological problems such as depression and suicidality. As the Standards of Care explain:

> Hormone therapy can provide significant comfort to gender patients who do not wish to cross live or undergo surgery, or who are unable to do so. *In some patients, hormone therapy alone may provide sufficient symptomatic relief to obviate the need for cross living or surgery.*

*Id.* at 14 (emphasis added).[5]

Pursuant to the Standards of Care, in order to be eligible for hormones, an individual must, among other things, have a documented real life experience of living as a member of the opposite sex for three months or at least three months of psychotherapy. Ex. 7, at 13.

The Standards of Care expressly address the issue of hormone therapy for certain prisoners:

> Hormone Therapy and Medical Care for Incarcerated Persons. Persons who are receiving treatment for gender identity disorders should continue to receive appropriate treatment following these Standards of Care after incarceration.

---

5. Dr. Forstein testified that, in recognition of the medical necessity of hormones for some transsexuals, Massachusetts now pays for hormones prescribed for indigent individuals being treated for gender identity disorders.

For example, those who are receiving psychotherapy and/or cross-sex hormonal treatments should be allowed to continue this medically necessary treatment to prevent or limit emotional liability, undesired regression of hormonally-induced physical effects and the sense of desperation that may lead to depression, anxiety and suicidality. Prisoners who are subject to rapid withdrawal of cross-sex hormones are particularly at risk for psychiatric symptoms and self-injurious behaviors. Medical monitoring of hormonal treatment as described in these Standards should also be provided. Housing for transgendered prisoners should take into account their transition status and their personal safety.

Ex. 7, at 14. Dr. Brown wrote this part of the Standards of Care. He persuasively explained that this statement does not mean that the Standards of Care intend to suggest that hormone therapy and other treatment need not be provided to prisoners who were not receiving such treatment prior to their incarceration. Rather, this is an issue not specifically addressed in, or resolved by, the Standards of Care.

If hormone therapy does not adequately alleviate a transsexual's distress, the Standards of Care generally contemplate a "real life experience" in which the person "fully adopt[s] a new or evolving gender role or gender presentation in everyday life." *Id.* at 17. Hormones are important to this effort. Ordinarily, the real life experience includes functioning in school, at work, or in the community as a member of the opposite sex, and being regarded as a person of that gender. *Id.* at 17–18. As Drs. Forstein and Brown convincingly testified, however, Kosilek's "real life" is prison. The fact that he is incarcerated does not mean that he could not have a real life experience within the meaning of the Standards of Care, which are expressly intended to be applied flexibly to accommodate a patient's unique social situation. *Id.* at 1.

Pursuant to the Standards of Care, after at least one year of a real life experience, including hormones, some individuals are candidates for sex reassignment surgery. *Id.* at 20. The Standards of Care state that:

> Sex Reassignment is Effective and Medically Indicated in Severe GID. In persons diagnosed with transsexualism or profound GID, sex reassignment surgery, along with hormone therapy and real-life experience, is a treatment that has proven to be effective. Such a therapeutic regimen, when prescribed or recommended by qualified practitioners, *is medically indicated and medically necessary*. Sex reassignment is not "experimental," "investigational," "elective," "cosmetic," or optional in any meaningful sense. It constitutes very effective and appropriate treatment for transsexualism or profound GID.

*Id.* at 18 (emphasis added).

The DOC has published policies concerning medical services for inmates. Among other things, it is the DOC's policy that, "[a]ccess to health care is an inmate's right and not a privilege" and that "[a]ll health care services shall be comparable in quality to that available in the community." Ex. 13, at § 630.01. This policy expressly applies to mental health services. Under the relevant contract, the private medical contractor is to have full responsibility for decisions concerning the type, timing and level of medical, dental and health services to be provided to inmates. Consistent with this, decisions concerning an inmate's health care are made by medical professionals, social workers employed by the DOC, and the specialists they often choose to consult.

Kosilek, however, has been dealt with differently, in part because of his lawsuit relating to his medical care. On the recommendation of Dr. Appelbaum, in early

2000, the DOC engaged Dr. Forstein, an expert in treating individuals with gender identity disorders, to examine Kosilek. Dr. Forstein was asked to address two questions raised by this court at a December 20, 1999 hearing: (1) whether Kosilek had a genuine gender identity disorder; and, if so, (2) what the recommended course of treatment would be if Kosilek were not incarcerated. These questions were relevant to Kosilek's pending motion for a preliminary injunction and to whether this case truly presented a constitutional question.

As the court explained at the December 20, 1999 hearing and in several subsequent Orders, if Kosilek were "not gender dysphoric, or if the requested estrogen therapy and sex change surgery would not be deemed medically necessary if [Kosilek] were not incarcerated, the court [would] not be required to decide whether the failure to provide the requested hormones and surgery violates [Kosilek's] Eighth Amendment rights. It is axiomatic that courts should not decide controversies on constitutional grounds if it is not necessary to do so. *See, e.g., Three Affiliated Tribes of Fort Berthold Reservation v. Wold Eng'g., P.C.,* 467 U.S. 138, 157, 104 S.Ct. 2267, 81 L.Ed.2d 113 (1984)." May 8, 2000 Order; *see also* Dec. 23, 1999 Order.

After reviewing records and examining Kosilek, Dr. Forstein provided the DOC with a March 15, 2000 report. Ex. 19. Dr. Forstein diagnosed Kosilek as having a gender identity disorder within the meaning of DSM–IV. He recommended that Kosilek receive psychotherapy with a qualified therapist who has knowledge of and experience with gender identity disorders; reinstitution of female hormones; consultation with an experienced surgeon who specializes in sexual reassignment; psychiatric monitoring; and giving Kosilek access to personal care items such as makeup. *Id.*

In explaining the bases for his recommendations, Dr. Forstein wrote, among other things, that:

> [Kosilek] had no homicidal or suicidal ideation, although he acknowledged two prior suicide attempts which were significant for their level of potential lethality.

> \* \* \* \* \* \*

> He made a pact with himself that if at 50 he had not achieved his goal of becoming truly female, he would consider life hopeless and meaningless. He had no active suicidal ideation, but there was a sense that in the absence of becoming a female, he would not choose to continue living as a male. His sense of sadness and sense of loss for many things in his life, and for the loss of those years during which he might have lived as a woman was apparent. *One area of concern is the potential suicidality if this last chance [provided by his lawsuit] to achieve his lifelong desire is denied. I believe that he would be a great risk for self harm, perhaps mutilation, if not suicide.*

*Id.* (emphasis added).

Dr. Forstein was engaged because of this litigation, rather than because the DOC professionals responsible for Kosilek's health had decided to consult an outside expert to diagnose and treat Kosilek. Accordingly, Dr. Forstein's advice was not considered primarily or exclusively by the DOC professionals responsible for mental health matters, who would typically determine whether an inmate had a mental illness and, if so, the appropriate treatment for it.

Rather, the decision on how to deal with Kosilek and any other prisoner suffering from a gender identity disorders was, as a practical matter, made by Maloney in his capacity as the Commissioner of the DOC, in consultation with his attorneys, mental

health professionals, and several members of his staff. Therefore, Maloney is the person on whom the court must focus in determining whether the deliberate indifference required to establish a violation of the Eighth Amendment has been proven in this case.[6]

Maloney previously served as the head social worker for the DOC. Maloney testified, however, that he was not qualified to make medical judgments. Rather, he has to seek advice from the medical professionals, particularly in this matter Drs. Appelbaum and Packer of the University of Massachusetts Medical School. That institution has a three-year, $18,000,000 contract to provide mental health services to inmates in the custody of the DOC.[7]

In about April 2000, a meeting to discuss this case and the possible issuance of guidelines for dealing with inmates with gender identity disorders was planned. In anticipation of that meeting, Dr. Packer spoke with the attorneys for the DOC and others who worked for Maloney. As a result, he understood "from the get go" (meaning "immediately") that Maloney did not want to provide Kosilek or any other inmate hormones or sex reassignment surgery.

Dr. Packer had no experience with gender identity disorders. To prepare for the meeting with Maloney, he did a search of the medical literature. He found a 1996 article by Dr. Robert Dickey and others in Canada, "Transsexuals within the Prison System: An International Survey of Correctional Services Policies," which had been published in Peterson, et al., 14 *Behavioral Sciences and the Law* 219–29 (1996).

On April 18, 2000, Dr. Packer sent a memorandum to Dr. Appelbaum and several members of Maloney's staff, but not to Maloney himself. In that memorandum, Dr. Packer distilled what he characterized as "the gist of the article." Ex. 12. He wrote that the authors had conducted a survey of sixty-four prison programs from Europe, Canada, Australia, and the United States, and reported that "[n]one had a policy that allowed for sex reassignment surgery and 'the vast majority of respondents indicated that there were no circumstances whereby sex reassignment would be considered for an already incarcerated transsexual.'" *Id.* Dr. Packer also wrote that in Dr. Dickey's view: "The best principle in management of transsexuals is to 'freeze-frame' the inmate at the state he or she was at on the date of their arrival in the system, *i.e.*, maintain the status quo." *Id.* According to Dr. Packer's memorandum, "pursuant to this approach: Inmates should be maintained on hormones only if they had previously been a candidate for sex reassignment surgery and if they were prescribed by a recognized expert in treating gender disorders." *Id.*

On April 28, 2000, Maloney met for about thirty minutes with his attorneys, Drs. Appelbaum and Packer, John Noo-

---

**6.** At the January 29, 2002 final pretrial conference, defendant's counsel stated that the court should focus on Maloney's state of mind for the purpose of determining whether deliberate indifference has been proven because Maloney was "the major decisionmaker." Jan. 29, 2002 Tr. at 4. That was also the plaintiff's position. *Id.* at 5. Defendant's counsel equivocated on this issue on the first day of trial, February 4, 2002. To the extent, if any, that the defendant now contends that Maloney is not the person whose state of

mind should be considered concerning deliberate indifference, that contention is not supported by the evidence. Rather, plaintiff has proven that Maloney is the person who made the most critical decisions concerning the medical care that would be offered to Kosilek.

**7.** The DOC contract for health services states that the provider is not obligated to pay for "sex change surgery or treatment," but does not prohibit such payments. Ex. 9, at 73.

nan, Director of the DOC Health Services Division, Hughes, and Kathleen Dennehey, the DOC Deputy Commissioner. Hughes and Drs. Appelbaum and Packer were seeking Maloney's ultimate decision on how to deal with Kosilek and any other transsexual inmates in the custody of the DOC. Maloney felt that the purpose of the meeting was to provide him with professional advice on what to do about a policy for inmates with gender identity disorders, rather than to discuss Kosilek. However, the instant lawsuit prompted the meeting and the decision to develop such a policy. Kosilek was discussed.

As of April 28, 2000, Maloney had not read Dr. Forstein's report. He was told that Dr. Forstein had diagnosed Kosilek as having a gender identity disorder and was recommending that Kosilek receive the treatment that was available in the community. Maloney was not then told, and did not then know, that Kosilek had twice attempted suicide and had also tried to castrate himself.

Maloney had not read Dr. Dickey's article or Dr. Packer's memorandum purporting to summarize it. Among other things, the Dickey article, but not Dr. Packer's memorandum, reported that twenty-seven of the sixty-four jurisdictions surveyed stated that they would decide on a case-by-case basis whether to initiate hormone therapy for an inmate and three more jurisdictions stated that they would consider initiating such treatment reasonable. Ex. 17, at 222. The article also reported that thirty reporting jurisdictions indicated that the risk of sexual assaults on transsexual inmates "was likely no higher than that faced by non-transsexual inmates," while another twenty-two stated that the risk of sexual assaults was "unknown." *Id.* at 223.

Maloney also had not read the Standards of Care. Nor was he told what they prescribed.

At the April 28, 2000 meeting, Maloney's attorneys discussed the judicial decisions in other cases involving transsexuals. Maloney was told that no reported case had held that the Constitution required initiating hormones for a prisoner not taking hormones before being incarcerated. Rather, he was told that court decisions indicated that mental health counseling was sufficient treatment for an inmate with a gender identity disorder. Maloney was told that Medicaid did not pay for hormone therapy or for sex reassignment surgery. In addition, Maloney was also told that Dr. Dickey's article advocated the freeze-frame approach in dealing with inmates with gender identity disorders.

At the meeting, Maloney expressed sincere and serious concerns about security within the prison if Kosilek or any other inmate were to receive hormones or sex reassignment surgery. Maloney understood that twenty-five percent of the inmates in his custody were sex offenders. He was worried that a person with breasts, living as a female in a male prison, would create a risk of violence that could injure prison guards, as well as inmates. He felt that even allowing an inmate to have make-up could facilitate attempts to escape. In addition, Maloney stated that he did not have the authority to place a person sentenced as a male in the female prison, MCI–Framingham, so that was not an option. In April 2000, Maloney believed that only three inmates having gender identity disorders had been in the custody of the DOC during the previous twenty-eight years.

Although he did not say so at the April 28, 2000 meeting, Maloney did not regard sex reassignment surgery as an appropriate use of taxpayers' money. Maloney and his colleagues, including Hughes, thought that any such expenditure would be politi-

cally unpopular.[8] Maloney did not want to authorize hormones or sex reassignment surgery for Kosilek or any other inmate unless he was legally obligated to do so.

Maloney announced at the April 28, 2000 meeting that he would adopt a freeze-frame policy for inmates having gender identity disorders. The DOC would provide hormones to any inmate who had previously been prescribed hormones, probably place that person in the general population of the prison, and deal with any security issues that might arise. The DOC would not, however, initiate hormones for an inmate for whom hormones had not been prescribed prior to his incarceration.

Drs. Appelbaum and Packer did not think that a medical or clinical decision had been made concerning Kosilek or any other inmate. Rather, they believed that an administrative decision had been made—one that prohibited certain forms of treatment for inmates with gender identity disorders who were not receiving prescribed hormones prior to their incarceration. Dr. Appelbaum, who had read the Standards of Care, and Dr. Packer, who had not, each thought that Maloney's administrative decision was clinically reasonable. They did not, however, express this view at the April 28, 2000 meeting.

As directed by Maloney at the April 28, 2000 meeting, Dr. Packer drafted "Guidelines for Mental Health Treatment of Inmates with Gender Identity Disorder" (the "Guidelines") to implement Maloney's decision concerning transsexual prisoners. As Dr. Packer testified, he was not then knowledgeable about individuals with gender identity disorders. At the time he drafted the Guidelines, Dr. Packer was still not aware of the Standards of Care.

Maloney approved the Guidelines. Drs. Appelbaum and Packer issued them on May 15, 2000. The Guidelines expressly apply only to inmates who were not on prescribed hormones prior to being incarcerated. Ex. 3 at 1. They state that they would need to be modified for individuals who were receiving hormones previously. *Id.* The Guidelines prohibit hormones and/or sex reassignment surgery from being provided for inmates who were not receiving hormones prior to incarceration because the "Department of Corrections has determined that [opportunities for the Real Life Experience that is recommended prior to sex reassignment surgery] cannot be afforded inmates since security and operational concerns do not allow inmates to dress and function as members of the opposite sex." *Id.*

The Guidelines permit Kosilek, as an individual who has not received prescribed hormones prior to incarceration, and others similarly situated, to receive "supportive therapy" to help "the inmate cope with the distress and stress associated with the desire to be of the opposite sex and the inability to change within the prison environment." *Id.*

In essence, the Guidelines provide that DOC personnel should try to help Kosilek and any other inmate having a gender identity disorder to cope with his plight, but categorically preclude the forms of treatment generally provided in the community in this country—no matter how severe and painful the inmate's mental illness may be—if the inmate was not receiving prescribed hormones prior to his incarceration.

After April 28, 2000, but prior to approving the Guidelines issued on May 15, 2000, Maloney read Dr. Forstein's report. Ac-

---

8. At the time of trial the DOC was supporting proposed legislation that would prohibit inmates with gender identity disorders from changing their names. The DOC had not expressed a view on another bill that would prohibit providing inmates with hormones and sex reassignment surgery.

cordingly, when the Guidelines were pro- . mulgated, Maloney understood that there were risks associated with the failure to treat a gender identity disorder, including the risk of acute depression, self-mutilation or autocastration, and suicide. He also knew that Dr. Forstein, at least, thought that there was a great risk that Kosilek would again attempt suicide if his gender identity disorder was not properly treated. However, following the April 28, 2000 meeting and prior to approving the Guidelines Maloney also learned that before Dr. Forstein's report was received DOC clinicians had not perceived a risk that Kosilek would commit suicide.

In any event, Maloney believed that many inmates present a risk of suicide. He knew that some succeed in killing themselves. Maloney thought, however, that established DOC procedures would prevent Kosilek from doing so. Consistent with this belief, the Guidelines provided for "crisis intervention as needed," in addition to "supportive therapy." *Id.*

On May 19, 2000, a mental health treatment plan (the "Treatment Plan") consistent with the new Guidelines was issued for Kosilek. Ex. 1, at 41. Dr. Packer asked DeWees to prepare it. Dr. Packer had still not read the Standards of Care or spoken to either Dr. Forstein or Dr. Dickey.

The Treatment Plan's primary stated goal was to help Kosilek develop "coping mechanisms to relieve [the] stress" related to his gender identity disorder. *Id.* Kosilek was to be offered bi-monthly individual treatment "to develop self-soothing strategies without violating DOC rules." *Id.* DeWees told Kosilek that self-soothing strategies meant "to think pretty thoughts." Feb. 4, 2002 Tr. at 72. Another therapist said that other self-soothing strategies included "counting to ten" and "telling yourself it is not worth it to get into trouble." *Id.* at 72–73.

DeWees told Kosilek and Dr. Packer that the Treatment Plan offered Kosilek nothing. She also told Dr. Packer that she did not feel that the plan permitted her to provide therapy to Kosilek. Dr. Packer disagreed.

After the Guidelines were issued, Maloney sought additional information concerning how other jurisdictions dealt with inmates with gender identity disorders. He contacted officials in Nebraska and New York, and was told that they do not have separate units for inmates with gender identity disorders.

Maloney also caused his staff to send out a survey to other jurisdictions. With one exception, however, he did not read the results or the somewhat misleading summary of them that was prepared.[9]

9. The responses to the survey, and purported summary of them, comprise Exhibit CCC.

The responses to the survey are hearsay. Contrary to defendant's contention, Exhibit CCC is not admissible under the "residual" hearsay exception. *See* Fed.R.Evid. 807. The court is not persuaded that the statements contained in Exhibit CCC bear the required equivalent circumstantial guarantees of trustworthiness, *see Schering Corp. v. Pfizer, Inc.,* 189 F.3d 218, 232–33 (2d Cir.1999), or that such statements are more probative on the issues presented than other available evidence. The residual exception is to be used sparingly, in exceptional circumstances. *See Doe v. United States,* 976 F.2d 1071, 1074 (7th Cir.1992) (citing *Idaho v. Wright,* 497 U.S. 805, 817, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990)). This is not such a case. Accordingly, Exhibit CCC is not admissible for the truth of the information provided in response to the survey.

To the extent that Maloney relied on Exhibit CCC, however, it would be admissible, not for its truth, but as evidence of whether Maloney acted with deliberate indifference. However, with the exception of the response from the United States Bureau of Prisons, Maloney did not read or rely on any part of Exhibit CCC in making decisions relevant to Kosilek. No other witness testified that he or she read the survey or communicated the substance of its

Maloney did see the faxed response to the survey from the United States Bureau of Prisons. It indicated to Maloney that the Bureau of Prisons adhered strictly to a freeze-frame approach. Maloney felt that was significant because he regarded the Bureau of Prisons as a large, quality "organization that you look to for direction when you're a Commissioner of Corrections." Feb. 6, 2002 Tr. at 43. The Bureau of Prisons' response to the survey also stated that inmates with gender identity disorders were not more likely to be subject to physical or sexual assaults than other inmates. Ex. CCC.

As discussed in § IV.3, *infra*, the Bureau of Prison's policy was not as rigid as Maloney understood it to be. While it did establish a presumptive freeze-frame approach, in contrast to the DOC's policy, it permitted exceptions to be made in appropriate cases and established a procedure for doing so.

In June 2000, Dr. Forstein was asked by representatives of the DOC whether his recommendations for treating Kosilek in prison would differ from those in his March 15, 2000 report, which addressed what he would prescribe if Kosilek were in the community rather than incarcerated. When Dr. Forstein stated that his recommendations regarding what was required to treat Kosilek adequately were not altered by the fact that Kosilek was incarcerated, the DOC terminated its relationship with him.

The DOC then retained as a consultant Dr. Dickey, an author of the article found by Dr. Packer. Dr. Dickey works at the Clarke Institute of Psychiatry, an organization in Canada that deals with gender identity disorders, among other things. Dr. Dickey and his colleagues at the Clarke Institute do not use the Standards of Care, which are regularly relied upon by experts in the United States and elsewhere for treating gender identity disorders. Rather, Dr. Dickey and his colleagues impose more rigorous requirements before prescribing hormones or authorizing sex reassignment surgery. More specifically, Dr. Dickey and his colleagues require, at a minimum, a real life experience during which a person lives for a year in the community as a member of the opposite sex before prescribing hormones. In Dr. Dickey's opinion, it is impossible for a person to have a real life experience in prison.

Dr. Dickey's approach would almost always preclude initiating hormones for an inmate for whom they had not been prescribed prior to incarceration. However, Dr. Dickey testified that a blanket policy prohibiting the initiation of hormones is "too strong."

On August 8, 2000, the court granted Maloney's motion to dismiss Kosilek's claims against him, in his individual capacity, for money damages, finding that Maloney had qualified immunity concerning those claims. Therefore, the sole remaining issue became whether Kosilek is entitled to injunctive relief because Maloney is violating Kosilek's rights under the Eighth Amendment.[10]

contents to Maloney. A memorandum, which was not produced at trial, purporting to summarize the survey results was read at a staff meeting. However, it is not proven that Maloney was present when the document was read. Deputy Commissioner Dennehy did testify, however, that she communicated to Maloney that the DOC was in the "mainstream" of departments of corrections. Accordingly, with the exception of the Bureau of Prisons response, Exhibit CCC has not been

considered by the court as evidence of whether Maloney acted with deliberate indifference. Dennehy's statement has been considered on this issue.

10. On August 8, 2000, the court also allowed the motion of David Nelson, the former Sheriff of Bristol County, for summary judgment because the evidence was not sufficient to permit a reasonable factfinder to conclude that Nelson had acted with deliberate indiffer-

Dr. Dickey evaluated Kosilek on February 16 and 17, 2001, in preparation for the trial of this case. In his view, while Kosilek had a gender identity disorder, as defined by the DSM–IV TR., Kosilek did not have a major mental illness. Dr. Dickey found Kosilek to be clear, coherent, and rational. Because he does not believe that a person can have a real life experience in prison, Dr. Dickey does not consider Kosilek to be a candidate for sex reassignment surgery.

Dr. Dickey has "some concern" about providing Kosilek with hormones. In his opinion, doing so would create a false hope that Kosilek would eventually receive sex reassignment surgery. However, Dr. Dickey testified that he would not totally rule out prescribing hormones for Kosilek. The fact that Kosilek has no chance of rejoining the community "confounds" that determination for Dr. Dickey. Nevertheless, if a treating professional found that Kosilek was depressed and not able to function because of his gender identity disorder, Dr. Dickey would recommend a trial of hormone treatment to determine whether that would improve his condition.

On September 14, 2001, the court denied Maloney's motion for summary judgment. In doing so, the court raised the question of whether it would be medically possible and legally sufficient for the DOC to prescribe medication for Kosilek that would reduce his psychological pain to the point where his gender identity disorder was not a "serious medical need," without treating Kosilek's underlying condition in any way. Trial was scheduled for November 2001.[11]

On October 16, 2001, Kosilek's mental health Treatment Plan was revised by Hughes, who is not a doctor and had never seen Kosilek, at least for the purposes of evaluation or treatment. Ex. 14. The stated purpose of the revised plan (the "Revised Treatment Plan") was to address Kosilek's acknowledged gender identity disorder and "history of depression as evidenced by previous reported suicide attempts and recent self-reports of depressed mood." *Id.* The Revised Treatment Plan stated that "[t]reatment will be provided by a licensed Mental Health Professional with knowledge of treatment issues pertaining to Gender Identity Disorder. In addition, the treating clinician will obtain consultation from Dr. Robert Dickey when necessary." *Id.* at 1. Responding to the question raised by the court on September 14, 2001, the Revised Treatment Plan for the first time provided that "[t]he option of a psychopharmacological evaluation is readily available to determine if symptoms might be ameliorated by psychotropic medications." *Id.* at 2. In preparing the Revised Treatment Plan, Hughes did not ask anyone or consider how hormones might affect the risk that Kosilek would commit suicide or mutilate himself.

There is no psychiatrist at MCI–Norfolk. In October 2001, Mark Burrowes was the social worker assigned to work with Kosilek. At that time, Burrowes had no training or experience working with individuals having gender identity disorders. He and several colleagues received about two hours of training on gender identity disorders prior to trial.

According to Burrowes, it was "strange" that a treatment plan for Kosilek was prepared without his participation. This was the only time that Burrowes was not in-

---

ence to Kosilek's known serious medical needs. The Court of Appeals for the First Circuit affirmed the court's decision. *See Kosilek v. Nelson,* C.A. No. 01–1185, 29 Fed. Appx. 621 (1st Cir.Mar. 22, 2002).

11. The trial was postponed for several months because defense counsel became unavailable.

volved in developing the treatment plan for an inmate for whom he was responsible. Burrowes has met with Kosilek since the plan was issued in October 2001. In his opinion, the Revised Treatment Plan is not adequate to keep Kosilek from attempting suicide if he loses this case. In Burrowes' view, the Revised Treatment Plan is deficient because it makes no provision for therapy with anyone with expertise in gender identity disorders or for hormones. *Id.* at 54, 56. Burrowes also testified that because the Revised Treatment Plan "does not include treatment via hormonal therapy, this plan is basically nothing." *Id.* at 56.

As Kosilek testified, medications such as Prozac have at times been helpful in alleviating his emotional distress. However, as Dr. Brown credibly explained, treating depression with drugs, without addressing the causes of it, may actually increase the risk of suicide by giving depressed individuals the energy to act that they lacked previously. The fact that Kosilek has once attempted suicide while taking Prozac in jail indicates the risk of relying on medication alone in his case.

Kosilek has, at times, refused to cooperate fully with DOC therapists assigned to assist him in the past because they lacked expertise in dealing with gender identity disorders. Kosilek would, however, cooperate with a doctor who was properly qualified to address his condition and any social worker working with that doctor. As Dr. Dickey acknowledged, it would not be appropriate for him or any of his colleagues at the Clarke Institute to attempt to treat Kosilek because Dr. Dickey's role as a witness in this case would reasonably preclude the level of trust necessary for a proper therapeutic relationship.

As DeWees and Burrows, the DOC employees responsible for dealing directly with Kosilek, as well as Drs. Forstein and Brown testified, the DOC's

treatment plans for Kosilek have not been adequate to treat his condition. As indicated earlier, those plans have not been developed pursuant to the DOC's usual procedures. The Revised Treatment Plan did not result from a clinical decision by a doctor or social worker concerning Kosilek's condition and particular medical needs. Rather, it was derived from an administrative decision by Maloney that created a blanket policy prohibiting initiation of hormones for inmates for whom they were not prescribed prior to their incarceration. Even Dr. Dickey agrees with Drs. Forstein and Brown that a rigid blanket policy prohibiting the initiation of hormones in every case is not appropriate. This court concurs.

As a result of that blanket policy, however, no clinical assessment of Kosilek's individual circumstances and medical needs has been made. Rather, major forms of the treatment provided in the community in the United States pursuant to prudent professional standards have been eliminated as options by an administrative decision made by Maloney, who acknowledges that he is not qualified to decide what treatment is medically necessary for a particular inmate.

Maloney did not, however, adopt his policy in order to punish Kosilek. On April 28, 2000, Maloney was not aware of certain critical facts and had not actually inferred that there would be a substantial risk of serious harm to Kosilek—in the form of at least intense psychological pain, and quite possibly suicide or self-mutilation—as a result of the policy he decided to adopt. Although Maloney read Dr. Forstein's report, including the part describing Kosilek's attempts to kill and castrate himself, before approving the Guidelines, he still did not infer that Kosilek's condition created a substantial risk of serious harm to

him. Nor did Maloney reach this conclusion prior to testifying at trial.

The DOC's policy concerning gender identity disorders differs from its policy concerning other serious illnesses. As Hughes explained, if an inmate were depressed because he had cancer, the DOC would not limit its efforts to addressing the depression. Rather, it would also attempt to cure, or at least diminish, the cancer by providing care that would be regarded as adequate in the community. In any event, the court finds that the services now being offered to Kosilek are not sufficient to diminish his intense emotional distress, and the related risks of suicide and self-mutilation, to the point at which he would no longer be at a substantial risk of serious harm.

Maloney knows that the DOC medical staff regularly refer inmates to outside specialists if they present problems that are beyond the competence of the professionals who are on staff. The court fully accepts Maloney's testimony that if the doctors from the University of Massachusetts who are engaged to provide mental health care to inmates decided to bring in a specialist to treat Kosilek, he would not interfere. Such medical judgments are "what [he is] paying them for." Feb. 6, 2000 Tr. at 111. Indeed, Maloney sincerely believes that he has "never in [his] career interfered with a doctor's order for treatment and [has] no intention of doing so in the future," with regard to Kosilek or anyone else. *Id.* at 113.

Hughes credibly testified that if a qualified expert recommended that hormones be initiated for Kosilek, Hughes would consult Drs. Appelbaum and Packer. If they concurred, Hughes would recommend that Maloney follow that advice because that would be a medical judgment made by qualified professionals.

A decision to prescribe hormones for Kosilek would not be unprecedented. According to Dr. Brown, the federal Bureau of Prisons settled a case in which he participated by agreeing to provide hormones to Yolanda Burt, who had used only "black market" hormones before being incarcerated.

If a doctor retained by the DOC recommended that Kosilek receive hormones, Maloney and Hughes would continue to have security concerns. Kosilek is now safely living, as much as possible, as a female at MCI–Norfolk. He has, however, been abused at other facilities.

In any event, the DOC policy contemplates continuing hormones for any inmate for whom they were prescribed prior to incarceration. The DOC is prepared to protect the safety of such an inmate. As described earlier, such an inmate would probably be placed by Maloney in the general population of a male prison.

## III. APPLICABLE STANDARDS

Kosilek claims that Maloney has subjected him to cruel and unusual punishment in violation of the Eighth Amendment of the United States Constitution, which the Fourteenth Amendment makes applicable to the Commonwealth of Massachusetts. *See Estelle,* 429 U.S. at 101–02, 97 S.Ct. 285. The analysis in § IV below may be best understood in the context of the generally applicable standards for deciding an Eighth Amendment claim alleging a violation of an inmate's right to adequate medical care.

The Eighth Amendment, in pertinent part, prohibits the infliction of "cruel and unusual punishments." U.S. Const., Am. VIII. The "unnecessary and wanton infliction of pain" on an inmate violates the Eighth Amendment. *Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); *Estelle,* 429 U.S. at 104, 97 S.Ct. 285.

"[T]he primary concern of the drafters was to proscribe 'torture(s)' and other 'barbar(ous)' methods of punishment." *Estelle,* 429 U.S. at 102, 97 S.Ct. 285 (quoting Anthony F. Granucci, *Nor Cruel and Unusual Punishment Inflicted: The Original Meaning,* 57 Cal. L.Rev. 839, 842 (1969)); *see also Gregg,* 428 U.S. at 170, 96 S.Ct. 2909. However, "[t]he [Supreme] Court has not confined the prohibition embodied in the Eighth Amendment to 'barbarous' methods that were generally outlawed in the 18th century. Instead, the Amendment has been interpreted in a flexible and dynamic manner." *Gregg,* 428 U.S. at 171, 96 S.Ct. 2909. As the Supreme Court has explained, "the Clause forbidding 'cruel and unusual' punishments 'is not fastened to the obsolete but may acquire meaning as public opinion becomes enlightened by a humane justice.'" *Id.* (quoting *Weems v. United States,* 217 U.S. 349, 378, 30 S.Ct. 544, 54 L.Ed. 793 (1910)). Judicial decisions concerning the Eighth Amendment are properly part of a dialogue concerning the Amendment's ever-evolving meaning that also includes citizens, the representatives they elect to make laws, and the officials responsible for executing those laws.[12]

In essence, the Eighth Amendment prohibits punishments which are "incompatible with the evolving standards of decency that mark the progress of a maturing society ... or which involve the unnecessary and wanton infliction of pain." *Estelle,* 429 U.S. at 102–03, 97 S.Ct. 285 (internal quotations and citations omitted). As indicated earlier, "[t]he Amendment embodies broad, idealistic concepts of dignity, civilized standards, humanity, and decency.'" *Id.* at 102, 97 S.Ct. 285 (quoting *Jackson v. Bishop,* 404 F.2d 571, 579 (8th Cir.1968)).

■ "'The treatment that a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment.'" *Farmer,* 511 U.S. at 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (quoting *Helling v. McKinney,* 509 U.S. 25, 31, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993)). "The Amendment ... imposes duties on [prison] officials who must provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of inmates.'" *Id.* (quoting *Hudson v. Palmer,* 468 U.S. 517, 526–27, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984)).

With regard to health care, the Supreme Court explained in *Estelle* that evolving standards of decency and the duty not to unnecessarily and wantonly inflict pain are:

elementary principles [that] establish the government's obligation to provide medical care for those whom it is punishing by incarceration. An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met. In the worst cases, such a failure may actually produce physical "torture or a lingering death," the evils of most immediate concern to the drafters of the Amendment. In less serious cases, de-

---

**12.** The late Alexander Bickel, a distinguished constitutional scholar, expressed disappointment in the Supreme Court for failing to seize at least one opportunity to provoke and participate in such a dialogue. In criticizing the Court's failure to find that eleven years of detention on death row due to errors of the government constituted cruel and unusual punishment, Bickel wrote:

Thus a process might have been set in motion to whose culmination in an ultimate broader judicial judgment, at once widely acceptable and morally elevating, we might have looked in the calculable future.

A. Bickel, *The Least Dangerous Branch: The Supreme Court at the Bar of Politics,* 243 (1962).

nial of medical care may result in pain and suffering which no one suggests would serve any penological purpose .... The infliction of such unnecessary suffering is inconsistent with contemporary standards of decency as manifested in modern legislation codifying the common-law view that "(i)t is but just that the public be required to care for the prisoner, who cannot by reason of the deprivation of his liberty, care for himself."

429 U.S. at 103, 97 S.Ct. 285 (internal citations omitted). Therefore, the Supreme Court has stated that "prison officials must ensure that inmates receive adequate ... medical care." *Farmer*, 511 U.S. at 831, 114 S.Ct. 1970; *see also Harris v. Thigpen*, 941 F.2d 1495, 1504 (11th Cir.1991) ("Federal and state governments ... have a constitutional obligation to provide minimally adequate medical care to those whom they are punishing by incarceration."). *Meriwether v. Faulkner*, 821 F.2d 408, 411 (7th Cir.1987) ("A state has an affirmative obligation under the Eighth Amendment to provide persons in custody with a medical system that meets minimal standards of adequacy.").

However, the Supreme Court has also held that not "every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment." *Estelle*, 429 U.S. at 105, 97 S.Ct. 285. A mere accident or even negligence is insufficient. *Id.* "In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. It is only such indifference that can offend 'evolving standards of decency' in violation of the Eighth Amendment." *Id.* at 106, 97 S.Ct. 285.

In his dissent in *Estelle*, Justice John Paul Stevens asserted that the fact that a prisoner must rely on prison authorities to meet his medical needs because he cannot do so himself should render irrelevant for Eighth Amendment purposes the subjective motivation of prison officials. *Id.* at 109, 116–17, n. 13, 97 S.Ct. 285 (Stevens, J. dissenting); *see also Farmer*, 511 U.S. at 858, 114 S.Ct. 1970 (Stevens, J., concurring). In Justice Stevens' view, "[i]f a State elects to impose imprisonment as punishment for a crime ... it has an obligation to provide the person in its custody with a health care system which meets minimal standards of adequacy .... For denial of medical care is surely not part of the punishment which civilized nations may impose for crime." *Estelle*, 429 U.S. at 116 n. 13, 97 S.Ct. 285; *see also Farmer*, 511 U.S. at 858, 114 S.Ct. 1970 (Stevens, J., concurring).[13]

However, as the Supreme Court clarified in *Farmer*, a 1994 case involving a transsexual prisoner, Justice Stevens' view is not the law. In that case, the Supreme Court reaffirmed and amplified its ruling in *Estelle* that it must be proven that a prison official acted with deliberate indifference to a substantial risk of serious harm in order to establish a violation of the Eighth Amendment. *Farmer*, 511 U.S. at 835–47, 114 S.Ct. 1970.

Accordingly, the Supreme Court has held that a prison official has violated the Eighth Amendment if he is deliberately indifferent to an inmate's serious medical need. *See, e.g. Estelle*, 429 U.S. at 106, 97 S.Ct. 285; *Farmer*, 511 U.S. at 831, 114 S.Ct. 1970. Nevertheless, Maloney contends that in this case the Eighth Amendment has been violated only if it is proven that he acted "maliciously and sadistically

---

**13.** In *Farmer*, Justice Harry Blackmun agreed with Justice Stevens "that inhumane prison conditions violate the Eighth Amendment even if no prison official has an improper, subjective state of mind." 114 S.Ct. at 1986 (Blackmun, J. concurring).

for the very purpose of causing harm," which is the standard applied when prison officials are accused of using excessive force to quell a prison disturbance. *See Whitley v. Albers,* 475 U.S. 312, 320, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986). This contention is based on the Supreme Court's statement in *Whitley* that:

> The deliberate indifference standard articulated in *Estelle* was appropriate in the context presented in that case because the State's responsibility to attend to the medical needs of prisoners does not ordinarily clash with other equally important governmental responsibilities. Consequently, "deliberate indifference to a prisoner's serious illness or injury," can typically be established or disproved without the necessity of balancing competing institutional concerns for the safety of prison staff or other inmates.

*Whitley,* 475 U.S. at 320, 106 S.Ct. 1078 (internal citations omitted); *see also Hudson v. McMillian,* 503 U.S. 1, 4, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992).

However, the Supreme Court rejected a claim comparable to Maloney's in *Farmer,* stating:

> "[A]pplication of the deliberate indifference standard is inappropriate" in one class of prison cases: when "officials stand accused of using excessive physical force." In such situations, where the decisions of prison officials are typically made " 'in haste, under pressure, and frequently without the luxury of a second chance,' " an Eighth Amendment claimant must show more than "indifference," deliberate or otherwise. The claimant must show that officials applied force "maliciously and sadistically for the very purpose of causing harm,", or, as the Court also put it, that officials used force with "a knowing willingness that [harm] occur". This standard of purposeful or knowing conduct is not, however, necessary to satisfy the *mens* *rea* requirement of deliberate indifference for claims challenging conditions of confinement; "the very high state of mind prescribed by *Whitley* does not apply to prison conditions cases." *Wilson, supra,* 501 U.S., at 302–303, 111 S.Ct., at 2326.

*Id.* at 835–36 (certain internal citations and quotation marks omitted).

In *Farmer,* the Supreme Court quoted and reaffirmed its decision in *Wilson,* which involved, in part, complaints about medical care. *Id.* at 834–36, 114 S.Ct. 1970. In *Wilson,* the Supreme Court stated that:

> *Whitley* teaches that, assuming the conduct is harmful enough to satisfy the objective component of an Eighth Amendment claim, *see Rhodes v. Chapman,* 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981), whether it can be characterized as "wanton" depends upon the constraints facing the *official.* From that standpoint, we see no significant distinction between claims alleging inadequate medical care and those alleging inadequate "conditions of confinement." ... Whether one characterizes the treatment received by [the prisoner] as inhumane conditions of confinement, failure to attend to his medical needs, or a combination of both, it is appropriate to apply the 'deliberate indifference' standard articulated in *Estelle.*

501 U.S. at 303, 111 S.Ct. 2321 (some internal quotations omitted).

The reasoning, as well as the holdings, of *Farmer* and *Wilson* support the use of the deliberate indifference standard in the instant case. In contrast to *Whitley,* Maloney has not been required to act in haste. Rather, he has had many years to consider and decide what care, if any, to offer Kosilek. Therefore, the deliberate indifference standard articulated in *Estelle*

and reaffirmed in *Farmer* is applicable to the instant case.

Deliberate indifference has both a subjective and an objective component. *See Farmer*, 511 U.S. at 846 n. 9, 114 S.Ct. 1970; *Wilson v. Seiter*, 501 U.S. 294, 298–99, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991); *DesRosiers v. Moran*, 949 F.2d 15, 18 (1st Cir.1991). The degree of risk of harm is evaluated by an objective standard. *See Farmer*, 511 U.S. at 846 n. 9, 114 S.Ct. 1970. With regard to health care, to satisfy the objective portion of the standard, an inmate must show that he has a serious medical need and that this need has not been adequately treated.

Accordingly, the first thing an inmate must prove is that he has a serious medical need. Generally, an inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm in order to prove a violation of the Eighth Amendment. *Id.* at 835–47, 114 S.Ct. 1970. Therefore, "a serious medical need" is one that involves a substantial risk of serious harm if it is not adequately treated.

The First Circuit has also defined a serious medical need as one " 'that has been diagnosed by a physician as mandating treatment, or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.' " *Mahan v. Plymouth County House of Corr.*, 64 F.3d 14, 18 (1st Cir. 1995) (quoting *Gaudreault v. Mun. of Salem*, 923 F.2d 203, 208 (1st Cir.1990)); *see also Boateng v. O'Toole*, 1997 WL 828778, at *1 (D.Mass. May 30, 1997) ("A 'serious medical need' is defined as a condition that a reasonable physician would deem worthy of treatment and which, if left untreated, could result in further significant injury to the inmate or the wanton infliction of pain.").

"There is no underlying distinction between the right to medical care for physi-cal ills and its psychological or psychiatric counterpart." *Torraco v. Maloney*, 923 F.2d 231, 234 (1st Cir.1991) (internal quotations and citations omitted). Thus, "deliberate indifference to an inmate's serious mental health needs violates the [E]ighth [A]mendment." *Id.; see also Garcia v. City of Boston*, 115 F.Supp.2d 74, 82 (D.Mass.2000); *Steele v. Shah*, 87 F.3d 1266, 1269 (11th Cir.1996).

With regard to the level of care to be provided, the First Circuit has stated that, "it is plain that an inmate deserves *adequate* medical care." *United States v. DeCologero*, 821 F.2d 39, 42 (1st Cir.1987) (emphasis in original). "Adequate services" are "services at a level reasonably commensurate with modern medical science and of a quality acceptable within prudent professional standards." *Id.* at 43. Thus, reference to established professional standards is important to determining the adequacy of medical care. "Minimally adequate care usually requires minimally competent physicians." *Harris*, 941 F.2d at 1509.

The fact that an inmate is entitled to adequate medical care does not mean that he is entitled to ideal care or to the care of his choice. *DeCologero*, 821 F.2d at 42; *DesRosiers*, 949 F.2d at 18. There are practical constraints on prison officials and they have the right to exercise discretion in deciding which of several adequate treatments is chosen for a prisoner. *DeCologero*, 821 F.2d at 42–43; *DesRosiers*, 949 F.2d at 19.

Nevertheless, this discretion is not unbounded. As the First Circuit has repeatedly stated:

> Although this court has hesitated to find deliberate indifference to a serious need where the dispute concerns not the absence of help, but the choice of a certain course of treatment, deliberate indifference may be found where the attention

received is so clearly inadequate as to amount to a refusal to provide essential care.

*Torraco,* 923 F.2d at 234 (internal quotations and citations omitted); *see also Miranda v. Munoz,* 770 F.2d 255, 259 (1st Cir.1985); *Layne v. Vinzant,* 657 F.2d 468, 474 (1st Cir.1981). This statement of the applicable standard by the First Circuit is consistent with the standard utilized in other Circuits. *See, e.g., Ancata v. Prison Health Servs., Inc.,* 769 F.2d 700, 704 (11th Cir.1985) ("[M]edical care ... so cursory as to amount to no treatment at all may violate the [Eighth] Amendment"); *Harrison v. Barkley,* 219 F.3d 132, 138 (2d Cir.2000)("Even if prison officials give inmates access to treatment, they may still be deliberately indifferent to inmates needs if they fail to provide prescribed treatment"); *Steele,* 87 F.3d at 1269 ("[I]n this circuit, it is established that psychiatric needs and the quality of psychiatric care one receives can be so substantial a deviation from accepted standards as to evidence deliberate indifference to those serious psychiatric needs.").

Discharging the duty to provide an individual with adequate medical care in a prison environment can be challenging for prison officials. In 1991, the First Circuit stated that the practical constraints facing prison officials should be considered in evaluating the quality of medical care in an institutional setting, as well as in deciding the issue of deliberate indifference. *Des-Rosiers,* 949 F.2d at 19 (citing *Wilson,* 501 U.S. at 302, 111 S.Ct. 2321 (1991)).

In *Wilson,* however, the Supreme Court explained that the constraints facing prison officials were relevant to the subjective, state of mind component of the Eighth Amendment test, rather than to the objective component. 501 U.S. at 303, 111 S.Ct. 2321. More specifically, the Court wrote that, "assuming the conduct is harmful enough to satisfy the objective component of the Eighth Amendment claim, whether it can be characterized as 'wanton' depends upon the constraints facing the *official.*" *Id.* (emphasis in original). In 1993 the Supreme Court further clarified that the inquiry into whether deliberate indifference has been proven is "an appropriate vehicle to consider arguments regarding the realities of prison administration." *Helling,* 509 U.S. at 37, 113 S.Ct. 2475.

In view of the Supreme Court's decision and discussion in *Helling,* as well as the foregoing discussion in *Wilson,* this court doubts that the First Circuit would now deem practical constraints to be relevant to evaluating the adequacy of the care that is offered. As discussed below, however, practical constraints may appropriately be considered with regard to the subjective element of the Eighth Amendment inquiry.

If an prisoner satisfies the objective test, he must also satisfy the essential subjective prong to establish an Eighth Amendment violation. This component requires that "the official responsible for making the relevant decisions regarding an inmate's medical care both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. 1970.

As indicated earlier, because of this subjective state of mind requirement, not every failure to provide an inmate adequate medical care violates the Eighth Amendment. *Estelle,* 429 U.S. at 105, 97 S.Ct. 285. "An accident, although it may produce added anguish is not on that basis alone to be characterized as wanton infliction of unnecessary pain." *Id.* Similarly, medical malpractice due to the negligence of prison doctors may constitute a tort for which a prisoner can be compensated under state law, but not represent cruel and

unusual punishment. *Id.* at 107, 97 S.Ct. 285.

Although the issue has never been directly addressed, Supreme Court decisions suggest that the Eighth Amendment might not be violated if an inmate is denied adequate medical care because practical constraints imposed by the prison environment or competing constitutional duties make it truly impossible to provide such care. As indicated earlier, the constraints facing a prison official are relevant to whether his conduct can be characterized as "wanton." *Wilson,* 501 U.S. at 303, 111 S.Ct. 2321. Thus, the "realities of prison administration" are relevant to the issue of deliberate indifference. *Helling,* 509 U.S. at 37, 113 S.Ct. 2475. One of the realities of providing medical care to inmates is the duty of prison officials to take "reasonable measures to guarantee the safety of inmates." *Farmer,* 511 U.S. at 832, 114 S.Ct. 1970.

It is conceivable that a prison official, acting reasonably and in good faith, could perceive an irreconcilable conflict between his duty to protect the safety of inmates and his duty to provide a particular inmate with adequate medical care. If so, his decision not to provide that medical care might not violate the Eighth Amendment because the resulting infliction of pain on the inmate would not be unnecessary or wanton. Rather, such a decision might be reasonable. ·The Supreme Court has held that "prison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause." *Farmer,* 511 U.S. at 845, 114 S.Ct. 1970; *see also White v. Farrier,* 849 F.2d 322, 325 (8th Cir.1988) ("Denial of medical care that results in *unnecessary* suffering in prison is inconsistent with contemporary standards of decency and gives rise to a cause of action under 42 U.S.C. § 1983. Actions *without penological justification* may con-

stitute an unnecessary infliction of pain.") (emphasis added).

However, it would not be reasonable to deny an inmate adequate medical care because it would be expensive to do so. *Ancata,* 769 F.2d at 705; *Harris,* 941 F.2d at 1509. "Lack of funds . . . cannot justify an unconstitutional lack of competent medical care and treatment for inmates." *Ancata,* 769 F.2d at 705. As the Seventh Circuit stated in 1991:

> We do not agree that "financial considerations must be considered in determining the reasonableness" of inmates' medical care to the extent that such a rationale could ever be used by so-called "poor states" to deny a prisoner the minimally adequate care to which he or she is entitled. Minimally adequate care usually requires minimally competent physicians. It may also sometimes require access to expensive equipment, e.g. CAT scanners or dialysis machines, or the administration of expensive medicines.

*Harris,* 941 F.2d at 1509. In 1991, the Supreme Court noted that there was not "any indication that [any] officials have [ever] sought to use a [cost] defense to avoid the holding of *Estelle.*" *Wilson,* 501 U.S. at 301, 111 S.Ct. 2321.

Nor would it be reasonable for a prison official to fail to provide adequate medical care to a prisoner because it might be unpopular or controversial to do so. It is the primary purpose of the Bill of Rights, including the Eighth Amendment, to protect rights of minorities from the will of the majority. The minorities most needing such protection are often unpopular. Few others must rely on the guarantees of the Bill of Rights.

Relevant case law describes the circumstances in which federal courts across the United States have, or would, find prison

officials to be deliberately indifferent to an inmate's serious medical need.

In *Allard v. Gomez*, 9 Fed.Appx. 793, 795, 2001 U.S.App. Lexis 13321, at *9 (9th Cir. Jun. 8, 2001), a grant of summary judgment in favor of the defendant was reversed in a case in which an inmate with a gender identity disorder was denied hormones. In doing so, the court stated that:

> [t]here are at least triable issues as to whether hormone therapy was denied Allard on the basis of individualized medical evaluation or as a result of a blanket rule, the application of which constituted deliberate indifference to Allard's medical needs.

*Id.* Thus, in the context of a transsexual seeking hormones, the Ninth Circuit has indicated that the Eighth Amendment requires that decisions by prison officials concerning medical care must be based upon an evaluation of a prisoner's unique circumstances rather than pursuant to a general policy applicable to all prisoners.

*Allard* is consistent with the principles that emerge from many other relevant cases. Generally, decisions concerning medical care for an inmate must be based upon "sound medical judgment." *Chance v. Armstrong*, 143 F.3d 698, 704 (2d Cir. 1998). For example, as the Supreme Court stated in *Estelle*, a "doctor's choosing the 'easier and less efficacious treatment' of throwing away the prisoner's ear and stitching the stump may be attributable to deliberate indifference ... rather than an exercise of professional judgment." 429 U.S. at 104 n. 10, 97 S.Ct. 285 (quoting *Williams v. Vincent*, 508 F.2d 541, 544 (2d Cir.1974)).

Since the Supreme Court's decision in *Estelle*, many other courts have held that consciously choosing "an easier and less efficacious" course of treatment plan may constitute deliberate indifference, if the choice was made for non-medical reasons not rooted in a legitimate penological purpose. *See Chance*, 143 F.3d at 703; *Durmer v. O'Carroll*, 991 F.2d 64, 67–69 (3d Cir.1993) ("if the failure to provide adequate care ... was deliberate, and motivated by non-medical factors, then [plaintiff] has a viable claim"); *Waldrop v. Evans*, 871 F.2d 1030, 1035 (11th Cir.1989) ("grossly incompetent medical care or choice of an easier but less efficacious course of treatment can constitute deliberate indifference"); *Ancata*, 769 F.2d at 704 ("if necessary medical treatment has been delayed for non-medical reasons, a case of deliberate indifference has been made out"); *West v. Keve*, 571 F.2d 158, 162 (3d Cir.1978) ("Although plaintiff has been provided aspirin, this may not constitute adequate medical care. If deliberate indifference caused an easier and less efficacious treatment to be provided, the defendants have violated the plaintiff's Eighth Amendment rights by failing to provide adequate medical care."); *Wolfe v. Horn*, 130 F.Supp.2d 648, 653 (E.D.Pa.2001) ("[W]hile [transsexual prisoner prescribed Prozac] may have received medical attention in prison, there is a fact question [precluding summary judgment] as to whether [plaintiff] received any treatment for transsexualism.").

Finally, with regard to the generally applicable legal standards, the fact that this case now only involves possible declaratory and prospective injunctive relief, rather than monetary damages, is important. The court must focus on the circumstances at the time of the trial in February 2002. *See Farmer*, 511 U.S. at 845–46, 114 S.Ct. 1970. In order to obtain an injunction an inmate must prove that a prison official was, at the time of trial, "knowingly and unreasonably disregarding an intolerable risk of harm, and ... will continue to do so." *Id.* at 846, 114 S.Ct. 1970.

The Supreme Court has written that, "[i]f the evidence establishes that an in-

mate faces an objectively intolerable risk of serious injury, the defendants could not plausibly persist in claiming lack of awareness." *Id.* at 846 n. 9, 114 S.Ct. 1970. In such circumstances, prison officials are constitutionally required to "take reasonable measures to abate [the] intolerable risk." *Id.*

The foregoing general principles concerning the Eighth Amendment as applied to medical issues provide the following framework for analyzing Kosilek's claims. To prevail in this case, Kosilek must prove that: (1) he has a serious medical need; (2) which has not been adequately treated; (3) because of Maloney's deliberate indifference; and (4) that deliberate indifference is likely to continue in the future.

## IV. ANALYSIS

### 1. *Kosilek Has a Serious Medical Need*

It is undisputed that Kosilek has a gender identity disorder, which is a rare, medically recognized, major mental illness. A gender identity disorder is not, however, necessarily a serious medical need for which the Eighth Amendment requires treatment. As with other mental illnesses, gender identity disorders have differing degrees of severity. As the Standards of Care explain, some individuals with gender identity disorders manage to find their own comfortable, effective ways of living that do not require psychotherapy, hormone therapy, a real life experience, or sex reassignment surgery. Ex. 7, at 11. Thus, the Court of Appeals for the District of Columbia has correctly stated, "merely because someone is a transsexual, it does not inexorably follow that he or she needs psychotherapy" or any other form of treatment. *Farmer v. Moritsugu,* 163 F.3d 610, 615 (D.C.Cir.1998).

However, the evidence in this case demonstrates that Kosilek's gender identity disorder is severe. Kosilek's gender iden-tity disorder, and not any sense of guilt or despair about his life sentence, causes him intense and enduring mental anguish. It has prompted him to attempt suicide twice while incarcerated, and to try to castrate himself as well. There is a significant risk that he will attempt to kill, mutilate, or otherwise harm himself again if he is not afforded adequate treatment for his disorder. Kosilek's good behavior while incarcerated, and the hope that he currently holds, is a result of the litigation that he has initiated. Kosilek's stated intention to commit suicide is not merely a threat to manipulate the DOC or the court, but rather a sincere manifestation of his mental anguish. Kosilek will attempt, and perhaps succeed, in killing himself if he does not receive adequate treatment.

Kosilek's ardent desire for sex reassignment surgery is further evidence of the severity of his mental illness. "Someone eager to undergo this mutilation is plainly suffering from a profound psychiatric disorder." *Maggert v. Hanks,* 131 F.3d 670, 671 (7th Cir.1997). These facts alone demonstrate that Kosilek has a serious mental health need and will continue to be at a substantial risk of serious harm until he receives adequate treatment. *See, e.g., Torraco,* 923 F.2d at 235 n. 4 (attempted suicide in confinement and drug overdose sufficient to prove serious medical need); *Waldrop,* 871 F.2d at 1032 (self-mutilation by manic depressive sufficient to prove a serious medical need); *Steele,* 87 F.3d at 1267, 1270 (inmate subject to severe mood swings, who had twice attempted suicide and was considered a potential suicide risk had a serious medical need).

It is significant that Kosilek has also now been properly diagnosed by two doctors as having a disorder that requires treatment. *See Mahan,* 64 F.3d at 18; *Gaudreault,* 923 F.2d at 208. Dr. Forstein originally made his diagnosis and recom-

mendations while employed by the DOC. Dr. Brown provided a persuasive second opinion to the same effect after being retained by Kosilek's counsel. Their diagnoses and recommendations contribute to establishing that Kosilek has the serious medical need necessary to implicate the protection provided to prisoners by the Eighth Amendment. *See Mahan*, 64 F.3d at 18 (doctor's "prescription indicated that . . . Mahan needed and would benefit from [anti-depressant]. The record thus established a serious medical need."); *Cortes–Quinones v. Jimenez–Nettleship*, 842 F.2d at 556, 559 (1st Cir.1988) ("prison system memo stated that [plaintiff] needed treatment with a psychiatrist or a psychologist.").

### 2. Kosilek Has Not Been Offered Adequate Treatment For His Serious Medical Need.

The services now being offered to Kosilek are not sufficient to diminish his intense emotional distress, and the related risks of suicide and self-mutilation, to the point at which he would no longer be at a substantial risk of serious harm. Therefore, Kosilek has not been offered adequate care for his serious medical need. *See Farmer*, 511 U.S. at 831, 114 S.Ct. 1970.

Maloney contends that Kosilek has been offered some treatment for his gender identity disorder and that this case merely involves a legitimate exercise of a prison official's discretion to which the court must defer. *See DeCologero*, 821 F.2d at 42–43; *DesRosiers*, 949 F.2d at 19. However, contrasting the instant case with several on which the defendant relies helps to explain why this is a matter in which, to date, "the attention received [by Kosilek] is so clearly inadequate as to amount to a refusal to provide essential care." *Torraco*, 923 F.2d at 234.

The first two cases that Maloney cites for the proposition that only "some type of treatment [must] be made available to the transsexual prisoner" are *Supre v. Ricketts*, 792 F.2d 958, 963 (10th Cir.1986) and *Lamb v. Maschner*, 633 F.Supp. 351, 353–54 (D.Kan.1986). *See* Defs. Proposed Findings of Fact and Req'd Rulings of Law, at 19–20. As explained in *Meriwether*:

In *Supre v. Ricketts*, the plaintiff, an inmate in the Colorado Department of Corrections, was examined by two endocrinologists and a psychiatrist. These doctors considered estrogen treatment, but ultimately advised against it, citing the dangers associated with this controversial form of therapy. Instead they prescribed testosterone replacement therapy and mental health treatment consisting of a program of counseling by psychologists and psychiatrists. Given the wide variety of options available for the treatment of the plaintiff's psychological and physical medical conditions, the Tenth Circuit refused to hold that the decision not to provide the plaintiff with estrogen violated the Eighth Amendment as long as some treatment for gender dysphoria was provided. Similarly, in *Lamb v. Maschner*, the plaintiff, an inmate at the Kansas State Penitentiary, had been evaluated by medical doctors, psychologists, psychiatrists and social workers and was undergoing some type of mental treatment. As a result of this treatment, the court held that the defendant prison officials were not constitutionally required to provide the plaintiff with pre-operative hormone treatment and a sex change operation.

821 F.2d 408, 413–14 (7th Cir.1987).

*Meriwether* was a case in which "[s]ince the inception of her incarceration, [the transsexual] plaintiff ha[d] been denied all medical treatment—chemical, psychiatric

or otherwise—for her gender dysphoria and related medical needs." *Id.* at 410. In reversing a decision to dismiss an Eighth Amendment claim, the Court of Appeals for the Seventh Circuit wrote:

> The courts in *Supre* and *Lamb* both emphasized that a different result would be required in a case where there had been a total failure to provide any kind of medical attention at all. That is precisely the type of case before us. We agree with the Tenth Circuit that given the wide variety of options available for the treatment of gender dysphoria and the highly controversial nature of some of those options, a federal court should defer to the informed judgment of prison officials as to the appropriate form of medical treatment. But no such informed judgment has been made here.

*Id.* at 415.

Similarly, in the instant case, no informed medical judgment has been made by the DOC concerning what treatment is necessary to treat adequately Kosilek's severe gender identity disorder. Contrary to the DOC policy and customary practice, decisions concerning Kosilek were, as a practical matter, made by Maloney, rather than by the medical professionals employed by the DOC. Maloney properly acknowledged that he was not qualified to make medical judgments. Prompted by Kosilek's case, he sought to establish a general policy, the Guidelines.

However, the Guidelines preclude the possibility that Kosilek will ever be offered hormones or sex reassignment surgery, which are the treatments commensurate with modern medical science that prudent professionals in the United States prescribe as medically necessary for some, but not all, individuals suffering from gender identity disorders. The Guidelines, in effect, prohibit forms of treatment that may be necessary to provide Kosilek any real treatment. *See DeCologero*, 821 F.2d at

42. Maloney's decision to implement the Guidelines precluded the medical professionals and social workers he employs and regularly relies upon from even considering whether hormones should be prescribed to treat Kosilek's severe gender identity disorder.

Although not prohibited by the Guidelines, the DOC did not follow its common practice of engaging an expert to diagnose and recommend treatment for the rare disorder from which Kosilek is suffering. Moreover, when Dr. Forstein, the expert the DOC initially retained in connection with this litigation, recommended treatment that was prohibited by Maloney's policy, the DOC terminated his employment.

The First Circuit has indicated that an Eighth Amendment violation may be established by proof of failure to adjust an established policy to accommodate a serious medical need. *See Mahan*, 64 F.3d at 18. In explaining this, the court stated that "the seemingly inflexible [prison] policy relating to prescription medicines, coupled with limited 'medical officer' hours, could well have resulted in serious harm to Mahan." *Id.* at 18 n. 6.

Similarly, the Ninth Circuit held in *Allard* that denial of a treatment such as hormone therapy based upon a blanket rule rather than an individualized medical evaluation can constitute deliberate indifference to a serious medical need. 9 Fed. Appx. 793, 795, 2001 U.S.App. LEXIS 13321, at *4. In the instant case, even Maloney's expert witness, Dr. Dickey, testified that a rigid policy prohibiting the initiation of hormones for every inmate who was not receiving the prescribed hormones at the time of his incarceration is "too strong" and, therefore, inappropriate.

Moreover, contrary to Maloney's understanding, the United States Bureau of Prison's freeze-frame policy is not inflexible on this issue. As explained in *Mori-*

*tsugu,* 163 F.3d at 611, and described in defendant's proposed Exhibit DDD, the Bureau of Prisons Service Manual states, in pertinent part, that:

It is the policy of the [Bureau of Prisons] to maintain a transsexual inmate at the level of change existing upon admission. *Should the Clinical Director determine that either progressive or regressive changes are indicated, the Medical Director must approve these prior to implementation.* The use of hormones to maintain secondary sexual characteristics may be continued at approximately the same levels as prior to incarceration (with appropriate documentation from community physicians/hospitals) and with the Medical Directors approval.

Health Services Manual, Ch. 5, § 14 (emphasis added). Thus, the Bureau of Prisons' policy permits decisions concerning what treatment is medically necessary for transsexuals to be made on an individual basis, and contemplates the possibility of exceptions to the freeze-frame approach being made in appropriate cases with the approval of the Medical Director.

In *Moritsugu,* the Medical Director of the Bureau of Prisons responded to complaints by the transsexual inmate in a manner consistent with the policy which established a presumption of a freeze-frame approach, but provided for possible exceptions when medically necessary. 163 F.3d at 612.

As to hormones, Moritsugu stated that Farmer was not on hormones when she arrived in the federal prison system, and that he had not received a request for such treatment from the medical personnel of the facility in which she was incarcerated. As to castration, Moritsugu again emphasized that he had not received a recommendation for such treatment from the relevant medical personnel, and added that he would only consider authorizing castration if it was clinically necessary . . . .

*Id.*

The Bureau of Prisons has employed the flexibility provided by its policy in the case of Yolanda Burt. According to Dr. Brown, who was an expert in the *Burt* litigation, the Bureau of Prisons settled Burt's case by agreeing to provide hormones although Burt had used only "black market" hormones prior to being incarcerated.

Similarly, Correctional Services of Canada, the Canadian counterpart of the federal Bureau of Prisons, "does not insist that [a transsexual] inmate be on hormone therapy at the time of incarceration." *Kavanagh v. Attorney General of Canada,* B.C.H.R.T. T505/2298, at 9 (Aug. 21, 2001). Rather, Correctional Services of Canada too makes exceptions to its general freeze-frame policy if the initiation of hormone therapy is recommended by a recognized gender clinic consulted by Correctional Services of Canada. *Id.*[14]

**14.** While the court finds the Canadian experience to be illuminating, it only reinforces certain conclusions, compelled by the evidence in this case and the law of the United States. The court recognizes that the Supreme Court has at times expressed somewhat differing views on the degree to which the practices of the international community can properly be taken into account in determining whether certain conduct constitutes "cruel and unusual punishment." *Compare Thompson v. Oklahoma,* 487 U.S. 815, 830–31, 108 S.Ct. 2687, 101 L.Ed.2d 702 (1988) (practices of foreign countries, particularly Western European democracies, relevant to determining the evolving standards of decency that mark the progress of a maturing society) *and Knight v. Florida,* 528 U.S. 990, 120 S.Ct. 459, 463, 145 L.Ed.2d 370 (1999) (Breyer, J. dissenting) ("[T]his Court has long considered as relevant and informative the way in which foreign courts have applied standards roughly comparable to our own constitutional standards in roughly comparable circumstances.") *with Stanford v. Kentucky,* 492 U.S.

The DOC, however, has not considered, let alone made an informed medical judgment, concerning whether an exception to its freeze-frame policy is necessary to treat Kosilek adequately. The professionals on whom the DOC would regularly rely upon to treat Kosilek have not felt that they were permitted to address his needs adequately. DeWees told Dr. Packer, as well as Kosilek, that the May 19, 2000 Treatment Plan, which relied upon teaching Kosilek "coping mechanisms," offered him nothing. In her view, she was not authorized under the Treatment Plan to provide Kosilek with real therapy.

The Treatment Plan was revised by Hughes in October 2001 in response to questions raised by this court. However, Hughes is not a doctor and had never seen Kosilek. Burrowes, who ordinarily would have had a leading role in developing a treatment plan for one of his clients, was not consulted. Burrowes believes that the Revised Treatment Plan is inadequate to diminish the severe anguish caused by Kosilek's major mental illness or to prevent Kosilek from attempting to kill himself if he loses this case. In his view, the Revised Treatment Plan is "essentially nothing."

Again in response to an issue raised by the court, the Revised Treatment Plan does provide for the "option of pharmacological evaluation ... to determine if symptoms might be ameliorated by psychotropic medications." Ex. 14., at 2. However, this would not constitute treatment for Kosilek's gender identity disorder. *See Wolfe*, 130 F.Supp.2d at 653.

Nor would it be consistent with the DOC's practice with regard to other serious illnesses. As Hughes testified, if Kosilek had cancer, and was depressed and suicidal because of that disease, the DOC would discharge its duty to him under the Eighth Amendment by treating both his cancer and his depression. *Id.*

In any event, no qualified medical professional has evaluated Kosilek for the purpose of determining whether any antidepressant medication or other form of pharmacology would diminish his mental anguish and potential for self-harm to the point that his severe gender identity disorder would no longer be a serious medical need. In this case, it is questionable whether such medications would be sufficient. As Dr. Brown explained, anti-depressants actually increase the risk of suicide for some patients by giving them the energy to act. Kosilek has attempted suicide while taking Prozac. It would be a challenging task for a qualified medical professional to decide whether prescribing antidepressants for Kosilek would be appropriate and sufficient. As no such professional has addressed this issue, the question of the adequacy of such an approach is not now before the court.

The Revised Treatment Plan provides that Burrowes or his successor can consult Dr. Dickey "when necessary." Ex. 14, at 1. However, as Dr. Dickey acknowledged, in view of his role as defense witness in this case, it would not be appropriate for him or any of his colleagues at the Clarke Institute to attempt to treat Kosilek be-

361, 369 n. 1, 109 S.Ct. 2969, 106 L.Ed.2d 306 (1989) (practices of other nations cannot serve to establish the first Eighth Amendment prerequisite, that the practice is accepted among our people) *and Atkins v. Virginia*, —— U.S. ——, 122 S.Ct. 2242, 2265, 153 L.Ed.2d 335 (2002) (Scalia, J. dissenting) ("Equally irrelevant are the practices of the 'world community,' whose notions of justice are (thank-fully) not always those of our people"); *see also, Developments in the Law—International Criminal Law*, 114 Harv. L.Rev.1947, 2065–73 (2001). Accordingly, this court has not relied on the evidence or the law concerning the Canadian experience in deciding this case. In essence, the Canadian experience is not material to the court's factual findings or analysis, but is consistent with them.

cause the trust that is necessary for a proper therapeutic relationship could not reasonably be expected. Thus, the present Plan makes no real provision for a qualified specialist to evaluate Kosilek and assist in his treatment.

Moreover, the fact that Dr. Dickey testified in support of Maloney's position does not make this a case in which there is a disagreement between qualified professionals that a court should not second guess. *See DeCologero*, 821 F.2d at 42–43; *DesRosiers*, 949 F.2d at 19; *Supre*, 792 F.2d at 963. Maloney's decision to adopt a policy that would prohibit consideration of hormones and sex reassignment surgery for Kosilek was made long before Dr. Dickey was retained and evaluated Kosilek for the purpose of testifying in this case.

When the DOC retained Dr. Dickey, it understood, at least from his article, that it was his position that an inmate should be provided hormones only if they had been prescribed prior to his incarceration.[15] The DOC officials who retained Dr. Dickey may not have realized, however, that he and his colleagues at the Clarke Institute impose more rigorous requirements before prescribing hormones or authorizing sex reassignment surgery than prudent professionals in the United States and elsewhere, who adhere to the Standards of Care.

As a result of Maloney's policy decision, Kosilek is now being offered only counseling by Burrowes. Every case is unique. Not every transsexual requires even psychotherapy. Standards of Care, Ex. 7, at 11; *Moritsugu*, 163 F.3d at 615. Counseling may to be sufficient for some transsexuals. Standards of Care, Ex. 7, at 11; *See Lamb*, 633 F.Supp. at 353–54 (allowing defendant's motion for summary judgment

where evidence did not clearly indicate that prisoner was a transsexual, but he had been evaluated by doctors, psychiatrists, psychologists, and social workers, none of whom recommended hormones or surgery). However, the evidence in this case demonstrates that, as Burrowes, Dr. Forstein, and Dr. Brown testified, the counseling by Burrowes that is now being offered to Kosilek is not adequate treatment for the serious medical need that Kosilek's profound gender identity disorder constitutes. Rather, as indicated earlier, this is a case in which the attention being offered Kosilek is "so clearly inadequate as to amount to a refusal to provide essential care." *Torraco*, 923 F.2d at 234.

As Kosilek has proven that he has a serious medical need which is not being adequately treated, he has satisfied the objective component of the Eighth Amendment test. Therefore, the court must determine whether the DOC's failure to provide Kosilek with adequate medical care for his serious medical need is a result of deliberate indifference on the part of Maloney.

### 3. Maloney's Failure to Provide Kosilek With Adequate Care Has Not Been Due to Deliberate Indifference.

Kosilek has not proven the facts necessary to satisfy the subjective prong of the deliberate indifference test. Once again, as the Supreme Court explained in *Farmer*:

[A] prison official cannot be held liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety: *the official must both*

---

**15.** In this sense, this case is comparable to *Kavanagh*, B.C.H.R.T. T505/2298, at 10, in which the tribunal wrote that, "Dr. Dickey and the Clarke Institute's conservative approach to [hormone therapy and sex reassignment surgery] was well-known" to Correctional Services of Canada.

*be aware of facts from which the inference could be drawn and he must also draw the inference* .... [A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment.

*Farmer,* 511 U.S. at 837–38, 114 S.Ct. 1970 (emphasis added). This is essentially such a case.

As defendant agreed at the pretrial conference, and as the court now concludes, in this case it is necessary to focus on Maloney's state of mind to determine whether deliberate indifference has been proven. Maloney is not the focus of attention because of his official status as the Commissioner of the DOC. He is the responsible official because he was the "major decisionmaker" concerning Kosilek's medical care. Once again, Maloney issued a policy that prevented those dealing directly with Kosilek from considering forms of care prescribed by prudent professionals in the community for some individuals suffering from gender identity disorder. Thus, the DOC medical personnel were stripped of their usual authority to make an individualized decision concerning the care necessary to address adequately Kosilek's needs.

This case is, therefore, distinguishable from *Moritsugu,* where a transsexual inmate sued the Medical Director of the Bureau of Prisons for failing to respond adequately to his letters complaining about his medical treatment. 163 F.3d at 614–15. The District of Columbia Circuit found that the defendant had qualified immunity in part because: "Farmer's claims fall outside the scope of Moritsugu's role as Medical Director .... Moritsugu is not the person within the Bureau of Prisons who determines whether psychotherapy is required in a given case." *Id.* In the instant case, however, Maloney, as a prac-

tical matter, made the relevant decisions concerning Kosilek.

As described earlier, Maloney did not decide to adopt a policy that he knew would apply primarily to Kosilek in order to punish him. Nor was Maloney deliberately indifferent to Kosilek's plight. Rather, Maloney had not actually inferred that there would be a substantial risk of serious harm to Kosilek as a result of the policy he had adopted.

As of April 28, 2000, when Maloney made the policy decision that effectively prohibited qualified professionals from considering the full range of options that might be necessary to treat Kosilek adequately, Maloney had not read Dr. Forstein's report. Maloney was not aware that Kosilek had while incarcerated twice attempted suicide and also tried to castrate himself. Maloney did not then know of the severe psychological pain and mental anguish that Kosilek was suffering as a result of his major mental illness.

By May 15, 2000, when the Guidelines developed pursuant to his April 28, 2000 policy decision were issued, Maloney had read Dr. Forstein's report. He knew that there were risks of serious harm associated with the failure to treat a gender identity disorder. He also knew that Dr. Forstein, at least, thought that there was a great risk that Kosilek would again attempt suicide if his gender identity disorder was not adequately addressed as a result of the lawsuit he had instituted. Thus, Maloney was aware of facts from which he could have inferred that there was an excessive risk to Kosilek's health. *See Farmer,* 511 U.S. at 837, 114 S.Ct. 1970.

Nevertheless, from April 2000 through the trial of this case Maloney never actually formed the belief that there was a substantial risk of serious harm to Kosilek. Maloney knew that prior to receiving Dr.

Forstein's report DOC clinicians did not perceive a risk that Kosilek would commit suicide. In any event, through the time of trial Maloney believed that his policy for prisoners with gender identity disorders would provide minimally adequate care for Kosilek. Moreover, Maloney believed that the DOC's established procedures would prevent Kosilek from killing himself if that risk were real.

Accordingly, Maloney "knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent." *Id.* at 844, 114 S.Ct. 1970. This is not enough to prove deliberate indifference. *Id.*

There are several reasons why Maloney did not properly appreciate the substantial risk of serious harm presented by Kosilek's severe gender identity disorder. Maloney is not a medical professional. As he acknowledged, Maloney is not qualified to make medical judgments. While he did not believe that he was making a medical judgment concerning Kosilek, Maloney effectively precluded qualified professionals from doing so.

Maloney was substantially influenced by his attorneys' advice that, as of April 2000, no court had held that the Eighth Amendment required prison officials to provide hormones for an inmate for whom they had not been prescribed prior to his incarceration. Such advice of counsel is relevant to whether Maloney could be held personally liable for damages. Indeed, the court found that Maloney, in his individual capacity, had qualified immunity and dismissed Kosilek's claims for damages because the relevant law was not clearly established. *See* Sept. 12, 2000 Memorandum and Order. However, if Maloney had actually inferred that Kosilek was at substantial risk of serious harm, the advice of his attorneys would not have prevented a finding of deliberate indifference or precluded the issuance of an injunction.

A major problem in this matter is that Kosilek's condition has been treated primarily as presenting legal issues rather than medical questions. Maloney believed that providing Kosilek with hormones or sex reassignment surgery would raise security issues, and be politically controversial and unpopular. He believed that such treatment would not be an appropriate use of taxpayer money. Thus, Maloney has not wanted to provide Kosilek hormones or sex reassignment surgery treatment unless the law required him to do so.

As explained earlier, judgments concerning the care to be provided to inmates for their serious medical needs generally must be based on medical considerations. *See Estelle,* 429 U.S. at 104 n. 10, 97 S.Ct. 285; *Chance,* 143 F.3d at 703; *Durmer,* 991 F.2d at 67–69. However, "the realities of prison administration" are relevant to the issue of deliberate indifference. *Helling,* 509 U.S. at 37, 113 S.Ct. 2475; *Wilson,* 501 U.S. at 303, 111 S.Ct. 2321. One of those realities is the duty of prison officials to take "reasonable measures to guarantee the safety of inmates." *Farmer,* 511 U.S. at 832, 114 S.Ct. 1970. It has been, and remains, permissible for Maloney to consider the security implications of the medical care prescribed for Kosilek.

As described earlier, the mere fact that adequate medical care may be expensive would not excuse a prison official from his Eighth Amendment obligation to provide it. *Ancata,* 769 F.2d at 705; *Harris,* 941 F.2d at 1509; *see also Wilson,* 501 U.S. at 301, 111 S.Ct. 2321.

In 1991, in *Harris,* 941 F.2d at 1509, the Seventh Circuit rejected the contention that cost would properly be considered in deciding the reasonableness of the medical care offered to inmates.

However, in 1997, in dicta, the Seventh Circuit, without addressing its earlier holding in *Harris,* suggested that cost would

be a legitimate reason for denying hormones and sex reassignment surgery to an inmate with a gender identity disorder. *Maggert*, 131 F.3d at 671–72. The reasoning employed in *Maggert* is not, however, persuasive.

In *Maggert*, prison officials hired a psychiatrist to evaluate the plaintiff. *Id.* at 670–71. The psychiatrist found that *Maggert* did not suffer from a gender identity disorder and did not prescribe the estrogen the inmate was seeking. *Maggert* did not provide any expert evidence to controvert this opinion. *Id.* Thus, the Seventh Circuit held that he had not "created a genuine issue of material fact that would keep this case alive." *Id.*

The Seventh Circuit went on, however, to express views on the treatment of transsexuals that were not based on any evidence in the record and were not consistent with its holding in *Harris*. The court appropriately expressed skepticism concerning the cases that suggested that something less than hormonal and surgical procedures were adequate to "cure" a gender identity disorder. *Id.* The court went on to state:

Yet it does not follow that prisons have a duty to authorize the hormonal and surgical procedures that in most cases would be necessary to "cure" a prisoner's gender dysphoria. Those procedures are expensive and protracted.

*Id.*

The Standards of Care, however, explain that, "[i]n some patients hormone therapy alone may provide sufficient symptomatic relief to obviate the need for cross-living or surgery." Ex. 7, at 14. Hormones are evidently not expensive. Massachusetts pays for hormones that are prescribed for individuals being treated for gender identity disorder who are not incarcerated.

The evidence presented at trial did not indicate the cost of sex reassignment surgery. There is no showing that providing sex reassignment surgery for Kosilek would be more expensive than the treatments provided to some inmates with cancer, kidney failure, or any other serious medical condition.

In *Maggert*, the Seventh Circuit went on to state:

[W]e imagine as a practical matter it is extremely difficult to obtain Medicaid reimbursement for [sex reassignment surgery] . . . . Medicare does not pay for such operations; nor do standard health plans . . . . Withholding from a prisoner an esoteric medical treatment that only the wealthy can afford does not strike us as a form of cruel and unusual punishment.

*Id.* at 672.

The Seventh Circuit's reasoning, however, ignores a crucial constitutional consideration. The Supreme Court has never held that a law-abiding private citizen has a right to adequate medical care. It is, however, clearly established that an inmate has such a right. *See Estelle*, 429 U.S. at 103, 97 S.Ct. 285; *Farmer*, 511 U.S. at 831, 114 S.Ct. 1970 ("[P]rison officials must ensure that inmates receive adequate . . . medical care."); *Giroux v. Somerset County*, 178 F.3d 28, 31 (1st Cir. 1999); *Cortes–Quinones*, 842 F.2d at 558.

 In any event, in adopting his freeze-frame policy Maloney was not concerned about the actual cost of hormones or sex reassignment surgery. Rather, he was motivated in part by the concern that the expenditure of *any* amount of taxpayer money would be controversial. This is not a penological consideration. "Actions without a penological justification may constitute an unnecessary infliction of pain" in violation of the Eighth Amendment. *White*, 849 F.2d at 325. Thus, concern for controversy is not a constitutionally permissible basis for denying an inmate necessary medical care.

#### 4. Maloney is Not Likely to be Indifferent to Kosilek's Serious Medical Need in the Future.

If Kosilek had proven that Maloney has been deliberately indifferent to his serious medical need, he would have had to prove more to obtain the injunction he is seeking. To obtain an injunction Kosilek would also have had to prove that Maloney would continue in the future to knowingly and unreasonably disregard the significant risk of serious harm that has been proven in this case. *Farmer*, 511 U.S. at 846, 114 S.Ct. 1970. Indeed, when a constitutional violation is proven it is at times appropriate for a court to exercise its equitable discretion to give "prison officials time to rectify the situation before issuing an injunction." *Id.* at 847, 114 S.Ct. 1970.

The court expects that, educated by the trial record and this decision, Maloney and his colleagues will in the future attempt to discharge properly their constitutional duties to Kosilek. Maloney has not intended to punish Kosilek by denying him necessary medical care. Maloney has previously served as the head social worker for the DOC. He is genuinely concerned about the welfare of the inmates for whom he is ultimately responsible.

Kosilek's case has, however, presented Maloney with what has been for him a highly unusual, if not novel, issue. While concerns about security and public controversy have made him reluctant to do more for Kosilek than the law requires, the court does not expect that Maloney will be recalcitrant in the future.

Rather, the court expects that he will allow medical professionals to decide what would ordinarily be required to treat Kosilek adequately. He may then himself decide if there is a legitimate reason relating to prison administration, such as security, that makes it truly necessary to deny Kosilek that treatment.

More specifically, Maloney is now on notice that Kosilek's severe gender identity disorder constitutes a serious medical need. Therefore, the DOC has a duty to provide Kosilek adequate treatment. *Estelle*, 429 U.S. at 105–06, 97 S.Ct. 285; *Farmer*, 511 U.S. at 846 n. 9, 114 S.Ct. 1970.

It is permissible for the DOC to maintain a presumptive freeze-frame policy. However, decisions as to whether psychotherapy, hormones, and/or sex reassignment surgery are necessary to treat Kosilek adequately must be based on an "individualized medical evaluation" of Kosilek rather than as "a result of a blanket rule." *Allard*, 9 Fed.Appx. 793, 795, 2001 U.S.App. LEXIS 13321, at *4. Those decisions must be made by qualified professionals. *Waldrop*, 871 F.2d at 1035–36; *Harris*, 941 F.2d at 1509. Such professionals must exercise sound medical judgment, based upon prudent professional standards, particularly the Standards of Care. *Estelle*, 429 U.S. at 104 n. 10, 97 S.Ct. 285; *Chance*, 143 F.3d at 704; *DeCologero*, 821 F.2d at 42.

Thus, the court expects that Maloney will follow the DOC's usual policy and practice of allowing medical professionals to assess what is necessary to treat Kosilek. As the DOC does not employ anyone with expertise in treating gender identity disorders, the DOC may decide to follow its regular practice of retaining an outside expert to evaluate Kosilek and to participate in treating, or recommending treatment for, him.

The evidence demonstrates that, at a minimum, Kosilek should receive genuine psychotherapy from, or under the direction of, someone qualified by training and experience to address a severe gender identity disorder. It will be Kosilek's obligation to cooperate in establishing a proper relationship with his therapist(s). The Standards

of Care indicate that such therapy, or such therapy and pharmacology, may be sufficient to reduce the anguish caused by Kosilek's gender identity disorder so that it no longer constitutes a serious medical need. Ex. 7, at 11.

If psychotherapy, and possibly psychopharmacology, do not eliminate the significant risk of serious harm that now exists, consideration should be given to whether hormones should be prescribed to treat Kosilek. Administering female hormones to a male prisoner in a male prison could raise genuine security concerns. *Farmer*, 511 U.S. at 848, 114 S.Ct. 1970. Maloney would be entitled to consider whether those concerns make it necessary to deny Kosilek care that the medical professionals regard as required to provide minimally adequate treatment for his serious medical need.

If this issue arises, Maloney may wish to consider that Kosilek is already living largely as a female in the general population of a medium security male prison. This has not presented security problems.

Moreover, under the Guidelines, Maloney is prepared to accommodate inmates who enter prison on prescribed hormones, probably by placing them in the general population of a male prison. Other state prison officials have apparently been able to do so safely. *See Phillips v. Mich. Dept. of Corr.*, 731 F.Supp. 792, 792 at n. 1. (W.D.Mich.1990), *aff'd*, 932 F.2d 969 (1991) (issuing preliminary injunction requiring the reinstitution of previously prescribed hormones); *Murray v. United States Bureau of Prisons*, 106 F.3d 401, 1997 WL 34677 at *3–*4 (6th Cir.1997) (affirming prison decision to reduce dosage, but not eliminate, previously prescribed hormones).

The Bureau of Prisons also evidently addressed security concerns adequately when it settled Burt's litigation by initiating hormones. In addition, "[a]ccess to hormone therapy is now provided to transsexual inmates under [Correctional Services of Canada's] Health Services policy, on the recommendation of a recognized Gender Identity Disorder Clinic if the inmate was not 'on hormone therapy at the time of incarceration.'" *Kavanagh*, B.C.H.R.T. T505/2298, at 2, 9. In *Kavanagh*, the Canadian Human Rights Tribunal found that Correctional Services of Canada "had failed to establish that it cannot accommodate [transsexuals on hormones or after sex reassignment surgery] within the male prison population without incurring undue hardship." *Id.* at 32.

By making these observations, the court does not intend to denigrate the significance of Maloney's security concerns. Maloney estimates that twenty-five percent of the inmates in his custody are sex offenders. *Farmer* was a case in which a transsexual prisoner alleged deliberate indifference to his safety after he was beaten and raped while in the general population at a federal penitentiary. 511 U.S. at 830–31, 114 S.Ct. 1970. As the Supreme Court noted, however, "penitentiaries are typically higher security prisons that house more troublesome prisoners than federal correctional institutes." *Id.* at 831, 114 S.Ct. 1970.

Prison officials must " 'take reasonable measures to guarantee the safety of inmates,' " as well as to provide them with adequate medical care. *Id.* at 832, 114 S.Ct. 1970 (quoting *Palmer*, 468 U.S. at 526–27, 104 S.Ct. 3194). One way to attempt to discharge both of these duties to a transsexual inmate taking hormones is to make reasonable efforts to incarcerate him with a less dangerous population of other prisoners.

As the Standards of Care explain, "hormone therapy alone may provide sufficient

symptomatic relief to obviate the need for cross-living or surgery." Ex. 9, at 14. If psychotherapy, hormones, and possibly psychopharmacology are not sufficient to reduce the anguish caused by Kosilek's gender identity disorder to the point that there is no longer a substantial risk of serious harm to him, sex reassignment surgery might be deemed medically necessary. *Id.* at 18. If that occurs, Maloney may consider whether security requirements make it truly necessary to deny Kosilek adequate care for his serious medical need. If and when he makes such a decision, a court may have to determine again whether the Eighth Amendment has been violated.

## V. ORDER

While Kosilek has proven that defendant Michael Maloney has not provided adequate care for Kosilek's serous medical need, Kosilek has not proven that this has been a result of deliberate indifference or that Maloney will be deliberately indifferent to Kosilek's serious medical need in the future. Therefore, Kosilek has failed to prove that Maloney has violated the Eighth Amendment.

Accordingly, it is hereby ORDERED that judgment shall enter for the defendant.